**Securities and Exchange Commission v. DiBella**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term 2008

(Argued: May 14, 2009                                    Decided: November 25, 2009)

Docket Nos. 08-1673-cv(L); 08-3797-cv(CON)

_____

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee*,

−v.−

WILLIAM A. DIBELLA AND NORTH COVE VENTURES LLC,

*Defendants-Appellants*.

_____

Before:

MINER, WESLEY, *Circuit Judges*, and STANCEU,[*] *Judge*.

William DiBella and North Cove Ventures LLC (collectively "defendants-appellants") challenge a jury verdict in an enforcement action brought by the Securities and Exchange Commission (the "SEC") finding defendants-appellants liable for aiding and abetting: (1) violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5 by the Connecticut State Treasurer (the "Treasurer"), and (2) a related violation of section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6, by Thayer Capital Partners and its chairman (collectively "Thayer"). As evidence for

_____

[*] The Honorable Timothy C. Stanceu, Judge of the United States Court of International Trade, sitting by designation.

the underlying violations, the SEC alleged that the Treasurer, without informing the state treasury department, Governor, or relevant state legislative committee, invested assets from the state pension fund with Thayer, arranged for defendants-appellants to receive a fee for the investment from Thayer, and increased the amount of the pension fund investment with Thayer to increase defendants-appellants' fee. Defendants-appellants argue the Treasurer had no fiduciary duty to disclose this information to anyone, and the Advisers Act does not apply because the case involves a state government and a state pension fund. We disagree. First, Connecticut state law at the time of the alleged violation made the Treasurer a fiduciary of the fund with duties to disclose to at least the relevant legislative committee. Second, the Advisors Act applies because Thayer, not the state, was the alleged violator.

As part of the jury instruction, the district court told the jury that as part of its case, the SEC had claimed defendants-appellants had done "no meaningful work." Contrary to defendant-appellants' contention, the district court did not err in not providing a definition of this phrase. Nor did the district court abuse its discretion in admitting evidence of prior bad acts of the Treasurer, imposing civil penalties on defendants-appellants, or demanding defendants-appellants disgorge the fee they earned as a result of the violations.

AFFIRMED.

—————

JAMES A. WADE, (William J. Kelleher, III, Thomas J. Donlon, *on the brief*), Robinson & Cole LLP, Stamford, CT, *for Defendants-Appellants*.

LUIS DE LA TORRE, Senior Litigation Counsel (Jacob H. Stillman, Solicitor, *on the brief*), *for* Andrew N. Vollmer, Acting General Counsel, Securities and Exchange Commission, Washington, D.C., *for Plaintiff-Appellee*.

—————

WESLEY, *Circuit Judge*:

**Background**

William DiBella ("DiBella") and North Cove Ventures LLC ("NCV") (together

"defendants-appellants") appeal from a judgment entered in the United States District Court for

the District of Connecticut (Burns, *J.*), following a jury verdict, in an enforcement action brought

by the Securities and Exchange Commission (the "SEC"). Specifically, defendants-appellants

challenge: (1) the jury having found defendants-appellants liable for aiding and abetting violations of section 10(b) ("section 10(b)") of the Securities Exchange Act of 1934 (the "34 Act"), codified as 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and section 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act"), codified as 15 U.S.C. § 80b-6; and (2) the district court having denied defendants-appellants' motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59(a), and imposed penalties on defendants-appellants.

Paul Silvester ("Silvester") served as Connecticut State Treasurer (the "Treasurer") from 1997 to 1999. As Treasurer, Silvester managed the Connecticut Retirement and Trust Funds (the "Fund"), the pension fund for approximately 150,000 employees of the State of Connecticut, valued at the time at approximately $18 billion. *SEC v. DiBella*, No. 3:04 CV 1342 (EBB), 2005 WL 3215899, at *1 (D. Conn. Nov. 29, 2005) (*DiBella I*).

DiBella was a Connecticut State Senator from 1981 to 1996, and while in office he served on the Investment Advisory Council (the "IAC"), the committee that oversaw investments made by the Treasurer on behalf of the Fund. After serving in the legislature, DiBella formed NCV to further his consulting business. *SEC v. DiBella*, No. 3:04 CV 1342 (EBB), 2007 WL 2904211, at *1 (D. Conn. Oct. 3, 2007) (*DiBella II*).

In the fall of 1997, DiBella introduced Silvester[1] to Joseph Grano Jr., president of PaineWebber & Co. ("PaineWebber"), at that time a brokerage and asset management firm. As a

---

[1] DiBella and Silvester had a friendship that pre-dated the events of this case. *See DiBella II*, 2007 WL 2904211, at *2.

result of that meeting, Silvester approved a $100 million investment by the Fund with PaineWebber. *Id.* at *2. Both Silvester and DiBella were under the impression that DiBella would receive a finder's fee for arranging the meeting between Silvester and Grano. *Id.* When DiBella discovered he would not be paid because he did not qualify as a finder under PaineWebber's internal process, DiBella asked Silvester to intercede with Grano. After Silvester and DiBella had still failed to convince Grano to pay DiBella a year later, Silvester told DiBella that he "would try to work something else out."

On November 11, 1998, the day after Silvester and DiBella met with Grano, and eight days after Silvester lost re-election as Treasurer, Silvester telephoned Frederic Malek, chairman of Thayer Capital Partners ("Thayer"), an investment firm, to notify Malek that Silvester intended to invest $50 million of Fund assets with Thayer. *DiBella I*, 2005 WL 3215899, at *2. Thayer, with the help of Merrill Lynch, had been trying to solicit the Treasurer to invest Fund assets with Thayer since August 1998. *DiBella II*, 2007 WL 2904211, at *2. An officer at the Treasurer's office, Michael MacDonald, initially rejected the Thayer investment but eventually recommended a maximum investment by the Fund of $25 million. *Id.*

Silvester instructed Malek to talk to DiBella regarding a finder's fee. *DiBella I*, 2005 WL 3215899, at *2. Malek felt that DiBella "could be helpful in developing a relationship with the new [T]reasurer" and with "expediting and consummating the document process" for the Fund investment, but Malek did not think that DiBella would be helpful in raising capital. At no point did DiBella inform Malek that because he was not a registered lobbyist he was precluded by Connecticut state law from representing Thayer in negotiations with the Treasurer.

Silvester hoped DiBella would be a "representative of the state of Connecticut . . . and earn a finder's fee." Silvester thought that allowing DiBella to be part of the Thayer investment would "take care of" DiBella for the PaineWebber deal and for his help with Silvester's campaign for re-election as Treasurer, while solidifying a "future business and political relationship[]." DiBella also viewed the Thayer fee as a way for Silvester to compensate DiBella for the PaineWebber deal.

After just one conversation with Malek, and without any knowledge of where Thayer planned to invest the money, DiBella asked Silvester to increase the Fund's investment with Thayer from $50 million to $75 million. Silvester obliged. *DiBella II*, 2007 WL 2904211, at *1. Silvester indicated that he "revisited . . . and reconsidered" the investment and increased the amount the Fund invested with Thayer solely because of DiBella's request. DiBella testified that he made the request knowing that as the amount of Fund moneys invested increased, his fee would increase. Silvester also indicated that by increasing the amount of the Fund's investment with Thayer, Silvester was also increasing DiBella's fee. Malek, on the other hand, testified that he was "relatively indifferent to raising [the Fund investment] to [$]75[million]" because the investment portfolio was "fully subscribed." DiBella and Malek agreed that DiBella – and thereby NCV – would receive a fee for his services in arranging the Fund's investment with Thayer.

On November 24, 1998, Silvester – now a lame duck Treasurer – committed $75 million of Fund assets to Thayer for investment, which, according to Silvester, was a typical amount for a Fund investment. *Id.* On November 30, 1998, defendants-appellants signed an agreement with

Thayer to consult and represent Thayer regarding the Fund investment in exchange for $525,000. *Id.* In December 1998, Thayer paid defendants-appellants $25,000. *Id.*

Upon the conclusion of his term in January 1999, Silvester was hired by Grano to work for PaineWebber. Denise Nappier succeeded Silvester as Treasurer in January 1999. When Nappier took office, she reduced the Fund's commitment to Thayer. *Id.* Correspondingly, Thayer reduced the amount owed to defendants-appellants to $374,500. *Id.* In March 1999, Thayer paid DiBella and NCV $349,500, the remainder owed them. *Id.* Malek testified that he was satisfied with the reduction and never needed to discuss investment strategies with DiBella.

In 2003, Silvester pled guilty to federal racketeering charges based on the predicate offense of conspiracy to commit money laundering. Silvester pled guilty because, among other things, he "asked Thayer to pay someone a finder fee in exchange for doing business with the [Fund]." The SEC then sued defendants-appellants for aiding and abetting (1) Silvester in violating section 10(b) and Rule 10b-5 of the 34 Act; and (2) Thayer and Malek in violating section 206(2) of the Advisers Act. *Id.* In particular, the SEC claimed "DiBella . . . engaged with Thayer, helped put the arrangement into the language of a consulting contract that did not reflect the true consideration and services to be provided, and collected fees under it."

After Silvester testified as to other transactions inculpating him for racketeering, the district court instructed, "[t]he jury will utilize the material for purposes of – all of this is offered . . . to describe Mr. Silvester's activities. At this point, I will remind you or tell you that Mr. DiBella is not accused in any way of being involved in transactions that have been enumerated so far." The district court later instructed: "you heard Mr. Silvester testify with respect to the

transactions as to [a] certain number of funds . . . . Mr. DiBella is not alleged to have been involved in any of these funds and, in fact, Mr. Silvester has so stated. . . . Mr. DiBella is not alleged to have any responsibility for that kind of activity." The district court went on to state that "[a]ny illegal act committed by Mr. Silvester which he has admitted is not coming in to be used against Mr. DiBella, it was merely to establish a foundation for the kind of activity that Mr. Silvester was involved in, that's all." At the conclusion of the trial, the district court again instructed the jury:

> You have heard evidence concerning certain criminal acts and charges against and involving Paul Silvester. Other than evidence involving Thayer Capital, those acts and charges did not involve Defendants DiBella or North Cove Ventures, LLC, and they are not alleged in this case to have been involved in those acts or charges. That evidence was presented at trial for the limited purpose by the Plaintiff of showing the criminal acts or charges against Silvester. You should not consider those acts or charges against the Defendants, but may consider them in determining whether Silvester committed a securities violation.

The district court also instructed the jury on the nature of the SEC's claims against defendants-appellants. The district court explained that defendants-appellants were charged with aiding and abetting Silvester's violations of section 10(b) of the 34 Act and Rule 10b-5, as well as aiding and abetting Thayer's violation of section 206(2) of the Advisor's Act. The district court explained that the SEC charged Silvester with violating section 10(b) and Rule 10b-5 "by engaging in a fraudulent scheme, pursuant to which he arranged, so as to pay for unrelated work, political favors, and future goodwill, for the [d]efendants[-appellants] to receive substantial fees despite providing no meaningful work in connection with Silvester's investment of . . . Fund money with Thayer" and by "fail[ing] to disclose this arrangement to the . . . Fund." The district

court explained that the SEC charged Thayer and Malek with violating section 206(2) by "breach[ing] their fiduciary duties to the . . . Fund when they entered into their arrangement with [defendants-appellants], to pay them a fee despite their providing no meaningful work, and without disclosing that they had done so to the . . . Fund."

As to the aiding and abetting claims, the district court instructed the jury that the SEC argued that defendants-appellants "were aware of the fraudulent nature of the fee arrangement and that they provided substantial assistance to the fraud by entering into the arrangement with Thayer, by successfully soliciting a larger investment by the Pension Fund in order to increase their fees, and by ultimately accepting payment despite having performed no meaningful services." The district court then instructed the jury as to the legal elements of violations of section 10(b) and Rule 10b-5, section 206(2), and aiding and abetting.

The jury found that Silvester violated section 10(b) and Rule 10b-5, Thayer violated section 206(2), and defendants-appellants knowingly aided and abetted all violations. The district court ordered DiBella to disgorge $374,500 and pay $307,127.45 in pre-judgment interest and $110,000 in civil penalties.

Defendants-appellants moved for judgment as a matter of law and, in the alternative, for a new trial. *DiBella II*, 2007 WL 2904211, at *1. Defendants-appellants claimed: (1) the SEC failed to prove the existence of a fraudulent scheme, as required by Rule 10b-5, because the SEC failed to prove that defendants-appellants provided no "meaningful work" in exchange for defendants-appellants' fee; (2) the jury instructions were flawed because they failed to provide a definition of "meaningful work"; (3) Silvester, as Treasurer, had no duty to disclose the fee

agreement between DiBella and Thayer and, therefore, Silvester could not have violated Rule 10b-5(b); and (4) the SEC failed to prove a primary violation of section 206(2) of the Advisers Act by Thayer, and even if this proof were established, defendants-appellants could not aid and abet the violation as a matter of law. *Id.* at *3.

The district court first found that a reasonable jury could conclude that Silvester was motivated by "a desire to receive political favors and repay DiBella for unrelated work" and that this qualified as a fraudulent scheme under Rule 10b-5, regardless of whether defendants-appellants provided any meaningful work to Thayer. *Id.* at *4-5. Next, the district court held that a jury could reasonably find defendants-appellants provided Silvester with substantial assistance because of DiBella's testimony that he asked Silvester to increase the amount of Fund assets invested with Thayer knowing that DiBella had not been hired to do this. *Id.* at *6.

Second, the district court held that the failure to give the jury a definition of "no meaningful work" did not constitute a fundamental error because the SEC's allegation that defendants-appellants performed no meaningful work was factual and "designed to add further support to their claim that the fee arrangement was a fraudulent scheme." *Id.* at *7. Further, the district court held that the jury did not need a definition of the phrase "because it was 'neither outside common understanding nor so technical or ambiguous as to require specific definition.'" *Id.* (quoting *United States v. Johnpoll*, 739 F.2d 702, 712 (2d Cir. 1984)).

Third, the district court held that a reasonable jury could find Silvester violated section 10(b) and Rule 10b-5 because: (1) Silvester was a fiduciary of the Fund and thus had a duty to disclose the fee arrangement to the IAC and to all Fund beneficiaries under Connecticut law; (2)

the information Silvester failed to disclose was material because Silvester increased the Fund investment with Thayer at DiBella's urging while DiBella admitted that he had no knowledge of whether $75 million was an appropriate amount to invest with Thayer; and (3) Silvester "acted with intent to defraud or with reckless disregard for the truth" because Silvester knew he had a fiduciary duty to the Fund and that his decision to increase the Fund's investment with Thayer "did not comport with this duty."*Id.* at \*8-10. The district court held that a reasonable jury could find that defendants-appellants knowingly aided and abetted Silvester's failure to disclose because DiBella knew of Silvester's fiduciary duty and because DiBella substantially assisted Silvester by urging Silvester to increase the Fund's investment with Thayer. *Id.* at \*10-11.

Fourth, the district court found that a reasonable jury could have concluded that Thayer was engaging in a transaction which operated as a fraud on the Fund in violation of section 206(2) of the Advisers Act because: (1) "the circumstances surrounding the fee arrangement with DiBella would lead an ordinarily prudent person to not enter into the agreement"; (2) Thayer failed to exercise reasonable care in entering into the agreement with the Fund and with defendants-appellants; and (3) Thayer breached its duty to disclose the fee agreement, as material information, "to another individual in the Treasurer's office not involved in the formation of the agreement in order to avoid injury to the Pension Fund." *Id.* at \*12. Thus, the district court held that a reasonable jury could find that defendants-appellants aided and abetted Thayer's section 206(2) violation because defendants-appellants knowingly provided substantial assistance to Thayer to increase the Fund's investment with Thayer. *Id.* at \*13.

Defendants-appellants appeal on several grounds: (1) as a matter of law "state

constitutional officers" have no "federal duty" to "disclose third-party contracts" and the "general verdict" should be reversed; (2) the district court erred in not instructing the jury on the terms "no meaningful work"; (3) the district court erred in applying the Advisers Act to the Fund, which is a state pension fund; (4) the district court erred in upholding aiding and abetting verdicts against defendants-appellants "where [defendants-appellants] had no duty to disclose and a primary violation was based on negligence"; (5) the district court abused its discretion in admitting evidence of prior bad acts of non-witnesses; and (6) the district court abused its discretion in imposing remedies such as a civil penalty "not authorized by statute."

**Discussion**

I.      Motions for New Trial and for Judgment as a Matter of Law

      A.      Standard of Review

This Court reviews the denial of a motion for new trial under Federal Rule of Civil Procedure 59(a) for abuse of discretion, *Espinal v. Goord*, 558 F.3d 119, 130 (2d Cir. 2009), but reviews the denial of a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) *de novo*, *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 226 (2d Cir. 2006).  B.      Silvester's Violations and Defendants-Appellants' Aiding and Abetting

           1.      Section 10(b) and Rule 10b-5 Violations

Section 10(b) of the 34 Act prohibits the "use or employ[ment]" of "any manipulative or deceptive device," "in connection with the purchase or sale" of a security.[2]  15 U.S.C. § 78j(b).

_____

[2] The parties stipulated that interest purchased by the Fund in Thayer constituted a security for purposes of the 34 Act.  *See DiBella II*, 2007 WL 2904211, at *1.

Rule 10b-5 states a similar prohibition. *See* 17 C.F.R. § 240.10b-5. The SEC has authority to bring civil enforcement actions against a defendant for violations of section 10(b) and Rule 10b-5. *See SEC v. Berger*, 322 F.3d 187, 193 (2d Cir. 2003). A defendant violates section 10(b) and Rule 10b-5 where: (1) "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter"; (2) a victim to whom the defendant had a duty reasonably relied on the defendant's action; and (3) that reliance caused the victim to be injured.[3] *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). In this case, the SEC argues that Silvester had a duty to disclose to the Fund the fee arrangement between defendants-appellants and Thayer because of Silvester's statutory obligations as a fiduciary of the Fund and because the fee arrangement was material. Defendants-appellants argue that the SEC failed to prove that Silvester had a fiduciary duty under federal or state law and that, even if Silvester had a duty to disclose information to the Fund, the fee arrangement was not material to the transfer of Fund assets to Thayer for investment.

i. Duty

Under section 10(b) and Rule 10b-5, "an omission is actionable under the securities laws only when the buyer is subject to a duty to disclose the omitted facts." *Vacold LLC v. Cerami*,

---

[3] We note that *Berger* suggests that the SEC may bring a civil enforcement suit to prevent a securities law violation and that in such a case the SEC may not need to prove "'demonstrable loss or injury.'" *Berger*, 322 F.3d at 193 (quoting *Berko v. SEC*, 316 F.2d 137, 143 (2d Cir. 1963)). However, because the state of Connecticut and the Fund claim demonstrable injuries we need not address the contours of such a scenario here.

545 F.3d 114, 121 (2d Cir. 2008). This Court has found that "[a] fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information," as can "unique access to information." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995).

Under Connecticut law, a fiduciary includes an administrator or trustee.[4] Conn. Gen. Stat. § 45a-199 (1999). A "trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule." *Id.* § 45a-541a(a) (1999). This includes "invest[ing] and manag[ing] trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements and other circumstances of the trust." *Id.* § 45a-541b(a) (1999). "In satisfying this standard, the trustee shall exercise reasonable care, skill and caution," *id.*, and "shall take reasonable steps to verify facts relevant to the investment and management of trust assets," *id.* § 45a-541b(d) (1999). More generally, "a fiduciary . . . relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Konover Dev. Corp. v. Zeller*, 635 A.2d 798, 805 (Conn. 1994) (internal quotation marks omitted).

The Treasurer is required to appoint a chief investment officer over the Fund who "serve[s] at the pleasure of the Treasurer." Conn. Gen. Stat. § 3-13a(a) (1999). The investment officer is charged with "advis[ing] the Treasurer on investing the trust funds of the state." *Id.*

---

[4] We focus our analysis on Connecticut law in force at the time relevant to this case – 1997 to 1999.

The statute implies that, notwithstanding the Treasurer's appointment of this officer to give him advice, the Treasurer still retains decision-making power over the investment of the Fund. Connecticut law also provides that the IAC review "[a]ll investments" by the Treasurer, and then recommend "investment polic[ies]" to the Treasurer relating to the "kind or nature of investment, including limitations, conditions or restrictions upon the methods, practices or procedures for investment, reinvestment, purchase, sale or exchange transactions." *Id.* § 3-13b(c). However, the statute does not give the IAC the authority to override the Treasurer or make independent investment decisions for the Fund. *Id.* Only the Governor "may direct the Treasurer to change any investments made by the Treasurer when in the judgment of [the IAC] such action is for the best interest of the state." *Id.* § 3-13b(c).[5]

As Treasurer, Silvester had the power of directing investment of the Fund, which could only be overridden by the Governor, and served as a "fiduciary," "administrat[or]," and "trust[ee]" for various state funds.[6] *See* Conn. Gen. Stat. §§ 3-13h(b), 3-14a & 3-22h (1999). He had the authority to form and execute any contracts necessary to carry out these duties.

---

[5] The current version, in relevant part, now requires that the Treasurer "provide to the [IAC] all information regarding such investments which the Treasurer deems relevant to the council's review" as well as "a report at each regularly scheduled meeting of the [IAC] as to the status of the trust funds and any significant changes which may have occurred or which may be pending with regard to the funds." Conn. Gen. Stat. § 3-13b(c)(2). The IAC is then required to "notify the Auditors of Public Accounts and the Comptroller of any unauthorized, illegal, irregular or unsafe handling or expenditure of trust funds or breakdowns in the safekeeping of trust funds or contemplated action to do the same within their knowledge." *Id.*

[6] One Connecticut Superior Court has noted that Silvester, as "treasurer of the state of Connecticut," was "sole fiduciary for the state's pension fund." *Statewide Grievance Comm. v. Hirschl*, No. CV010812540, 2003 WL 21299814, at *1 (Conn. Super. Ct. May 20, 2003).

Specifically with respect to the Fund, the Treasurer had a statutory obligation to submit for review all of the Fund investments he made. More generally, as a fiduciary, the Treasurer had an obligation to verify facts relevant to prudent investment on behalf of those who did not possess the information, such as the IAC, Governor, or Fund beneficiaries.

It would be a strange result indeed to conclude that a publicly elected official who controls billions of dollars of public moneys set aside for the benefit of thousands of public employees in Connecticut is not a fiduciary of those funds and has no fiduciary duties as to those funds. One would think the level of public cynicism about those who hold public office has not yet sunk to that level. The district court did not abuse its discretion in concluding that, at the time of the Thayer transaction, Silvester was a fiduciary such that he had a duty to disclose material omissions to at least the IAC.[7] Because Silvester had a duty under Connecticut state law, we need not determine whether he had a duty created by federal law.[8]

---

[7] Connecticut now requires that the Treasurer submit "any contract for services related to the investment of trust funds" to the IAC for review, Conn. Gen. Stat. § 3-13i, and prohibits "pay[ment] of finder's fees to any person in connection with any investment transaction involving the state," Conn. Gen. Stat. § 3-3l(a).

[8] We also need not address defendants-appellants' Tenth Amendment and federalism claims. In *United States v. Margiotta*, we held that the chairman of a county political party had a fiduciary duty to citizens of the county because of "his participation in government." 688 F.2d 108, 125 (2d Cir. 1982), *overruled on other grounds by McNally v. United States*, 483 U.S. 350 (1987); *id.* at 124 ("It requires little imaginative leap to conclude that individuals who in reality or effect are the government owe a fiduciary duty to the citizenry."). The *Margiotta* Court noted that it "need not reconcile the principles of federalism with the mandate of the mail fraud statute because Margiotta owed a fiduciary duty to the citizenry of [the town and county at issue] under New York law." *Id.* at 124. Likewise, because Silvester had a duty under Connecticut law, this Court need not address whether imposing a federal duty on Silvester would raise federalism or Tenth Amendment concerns. The SEC was not "conscript[ing Silvester] by assigning to [him] responsibility for enforcing federal laws," in violation of the Tenth Amendment. *Gillespie v.*

### ii. Materiality

"In order to determine whether a misleading statement is material, courts must engage in a fact-specific inquiry." *ECA, Local 134*, 553 F.3d at 197. "A fact will be considered material . . . if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *First Jersey Sec., Inc.*, 101 F.3d at 1466 (internal quotation marks omitted). "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important. On the other hand, it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). "[T]he determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances." *ECA, Local 134*, 553 F.3d at 197.

The district court did not abuse its discretion in determining that the fee arrangement for DiBella was material. The amount DiBella received from Thayer was contingent on the amount the Fund invested with Thayer. Silvester admits that he arranged to have DiBella receive a fee from Thayer, that he knew that DiBella's fee was contingent on how much the Fund invested with Thayer, and that he increased the amount of Fund assets invested with Thayer by 50%. A reasonable investor – or in this case the IAC, Governor, or Fund beneficiaries – may have viewed the fee arrangement, as it related to the level of Fund assets invested with Thayer, as changing the total mix of information, because it tends to show that Silvester may have been motivated to

*City of Indianapolis*, 185 F.3d 693, 707-08 (7th Cir. 1999) (internal quotation marks omitted). The SEC in this case seeks to hold Silvester, as a fiduciary, to the same standard that it would hold other fiduciaries in Connecticut.

increase the Fund investment with Thayer not because Thayer was a good investment but only to enrich DiBella.

Therefore, the district court did not abuse its discretion in determining that a reasonable jury could conclude that Silvester violated section 10(b) and Rule 10b-5.

### 2. Aiding and Abetting

"Liability for aiding and abetting can be established by showing that the defendant joined the specific venture and shared in it, and that his efforts contributed to its success, or, in other words, by showing that the defendant consciously assisted the commission of the specific crime in some active way." *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) (internal quotation marks and citations omitted); *see also* 15 U.S.C. § 78t(e). Specific to securities violations, the government must prove: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1985). "[T]he three requirements cannot be considered in isolation from one another." *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980). "Satisfaction of the [knowledge] requirement will . . . depend on the theory of primary liability[,] and . . . there may be a nexus between the degree of [knowledge] and the requirement that the alleged aider and abettor render 'substantial assistance.'" *Id.* Substantial assistance, in turn, requires a showing that "the aider and abettor proximately caused the harm to [the victim] on which the primary liability is

predicated."[9] *Bloor*, 754 F.2d at 62. Having established that the district court did not abuse its discretion in concluding that there was sufficient evidence to find that Silvester had committed a section 10(b) and Rule 10b-5 violation, we turn to the remaining two issues.

As a former member of the IAC, DiBella was aware of Silvester's duties as Treasurer to submit material investment information to the IAC for review and was aware that the IAC could use that information to make investment recommendations or ask the Governor to override the Treasurer's investment decisions. He knew that the Treasurer had the authority to make investment decisions for the Fund and could increase the amount the Fund invested with Thayer. DiBella also knew that his fee was contingent on how much the Fund invested with Thayer, and he asked Silvester to increase that amount without having consulted with Malek and without any knowledge of Thayer. DiBella knew he did no work in the Thayer investment process, and he also knew that the money he was receiving from Thayer was intended as payback for PaineWebber. Finally, it is relevant that DiBella was aware that Silvester arranged for DiBella to be involved with the Fund's investment with Thayer shortly after Silvester lost his election and had a limited amount of time to use his position as Treasurer to compensate DiBella for his work arranging the PaineWebber deal. Moreover, DiBella provided substantial assistance to Silvester's fraud by requesting that Silvester increase the Fund's investment in Thayer. Silvester testified that had DiBella not made such a request Silvester would not have increased the Fund's

---

[9] Since *Bloor*, the Supreme Court has held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). However, because this comes to us as an SEC enforcement action and not a private suit, *Bloor*'s language is still controlling and relevant. *See* 15 U.S.C. § 78t(e) (authorizing the SEC to enforce the 34 Act against aiders and abettors).

investment with Thayer. Therefore, the district court did not abuse its discretion in denying DiBella's motion for new trial because there was substantial evidence that DiBella knowingly aided and abetted Silvester in violating section 10(b) and Rule 10b-5.

C.      Aiding and Abetting Violations of the Investment Advisers Act

Section 206(2) of the Advisers Act prohibits any "investment advisor"[10] from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). As this Court and the Supreme Court have noted, the Advisers Act "'reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which was not disinterested.'" *SEC v. Wall St. Transcript Corp.*, 422 F.2d 1371, 1376 (2d Cir. 1970) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)). Hence, the Supreme Court has held that the government need not show intent to make out a section 206(2) violation, *see Aaron v. SEC*, 446 U.S. 680, 692 (1980) (noting the holding in *Capital Gains Research Bureau* with approval), nor is it "necessary, . . . in a suit against a fiduciary such as an investment adviser, to establish all the elements of fraud that would be required in a suit against a party to an arm's-length transaction," *id.* at 693.

---

[10] Title 15, section 80b-2(a)(11), of the U.S. Code provides:

"Investment advisor" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

In their challenge to the district court's decision with respect to Thayer's and defendants-appellants' respective violations of the Advisers Act, the defendant-appellants press three arguments: (1) the Advisers Act does not apply to the Fund because it is a public fund; (2) Thayer and Malek had no further duty to disclose the fee arrangement beyond reporting it to Silvester; and (3) it is impossible to aid and abet a negligent act.

1. Application of Advisers Act to the Fund

15 U.S.C. § 80b-2(b) provides that "[n]o provision in this subchapter shall apply to, or be deemed to include, . . . a State . . . any . . . [State] authority, . . . or any [State] officer . . . acting as such in the course of his official duty."  15 U.S.C. § 80b-2(b).  In one release, the SEC has written that a state pension fund was "exempt from the requirements of . . . the Investment Advisers Act" with respect to its investment in a corporation despite receiving material nonpublic information concerning a prospective acquisition by that corporation of another.  *See Report on Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The Retirement Systems of Alabama*, Exchange Act Release No. 57446 (Mar. 6, 2008).  Similarly, the SEC has stated that non-profit, state-run institutions are also exempt from the Advisers Act.  Mid-Atlantic Investment Network, SEC No-Action Letter, Fed. Sec. L. Rep. P 76,651 (May 18, 1993).

Notwithstanding these SEC opinions, however, Thayer and Malek may be held liable under section 206(2).  Thayer is not a state entity and Malek is not a state agent.  And while Thayer and Malek's "client"[11] – for purposes of section 206(2) liability – is the Fund, there is no

---

[11] The statute does not provide a definition of "client."

reason that this excludes Thayer or Malek from liability, given that the state is among the victims of Thayer and Malek's section 206(2) violations.

### 2. Duty to Disclose

Although there is no specifically enumerated duty to disclose in section 206(2), an investment advisor can avoid committing fraud on its clients by disclosing material information to them. *See Capital Gains Research Bureau, Inc.*, 375 U.S. at 181-82. The "legislative history [of the Advisers Act] leaves no doubt that Congress intended to impose enforceable fiduciary obligations" on investment advisors. *Transamerica Mortgage Advisers, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979). The SEC argues that Thayer and Malek, to avoid section 206(2) liability, had a duty: (1) to refrain from taking the Fund investment, or (2) to disclose the fee arrangement "to another individual in the Treasurer's office not involved in the formation of the agreement in order to avoid injury to the Pension Fund." *See DiBella II*, 2007 WL 2904211, at *12.

We have held that "[t]hird party disclosure to an agent is not imputed to the principal when the agent is acting adversely to the principal's interest and the third party has notice of this." *Arlinghaus v. Ritenour*, 622 F.2d 629, 636 (2d Cir. 1980). This would counsel that Thayer and Malek had a duty to disclose the fee arrangement to someone other than Silvester who could affect the investment decisions of the Fund because Malek, and therefore Thayer, knew that Silvester had arranged for DiBella to receive a fee for the Fund investment. However, we need not go so far as to impose a duty on Malek and Thayer to disclose to someone other than the Treasurer for purposes of 206(2) liability. Thayer and Malek are liable under section 206(2)

because they implemented Silvester's scheme to defraud the Fund, the State of Connecticut, and the Fund beneficiaries, although they knew or should have known that Silvester's investment was unlawful. Malek knew Silvester had arranged for DiBella to receive a fee from Thayer and that DiBella offered, or would offer, no investment advice. Malek also knew that Silvester was increasing the amount the Fund invested with Thayer consistent with DiBella's wishes and without any input from Thayer or Malek. In fact, the investment increase was counter to Malek's purported investment plan for Thayer, and yet Malek acquiesced to the increase without informing his client. Therefore, the district court did not abuse its discretion in determining that there was sufficient evidence for a reasonable jury to conclude that Thayer and Malek violated section 206(2).

### 3. Aiding and Abetting

The Advisers Act provides that the SEC may seek an enforcement action against aiders and abettors of "a violation of any provision" of the statute. 15 U.S.C. § 80b-9(d). The primary "violation" here is Thayer's "engag[ing] in [a] transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). The defendant-appellants argue that this provision permits a finding of Thayer's liability based on negligent acts, and, relying upon such reading of the statute, the defendants-appellants argue that they cannot aid and abet a negligent violation of the Advisers Act as a matter of law. We disagree.

As noted above, the Advisers Act "reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – *consciously*

*or unconsciously* – to render advice which was not disinterested." *Wall St. Transcript Corp.*, 422 F.2d at 1376 (internal quotation marks omitted; emphasis added); *see also Aaron*, 446 U.S. at 692. Consistent with this broad understanding of liability, the Advisers Act makes it unlawful to "engage in any transaction . . . which operates as a fraud." That is, any transaction that functions or otherwise results in a fraud is punishable under this provision. Thus, the Advisers Act holds liable negligent acts. And as the statute makes clear, the SEC may seek an enforcement action against aiders and abettors of "a violation of *any* provision" of the Advisers Act, 15 U.S.C. § 80b-9(d), which would include certain negligent acts in violation of the Advisers Act.

Here, there was substantial evidence to support a finding that DiBella aided and abetted Thayer and Malek's violation of the Advisers Act for implementing Silvester's fraudulent scheme, although they knew or should have known that the scheme was unlawful. DiBella understood that his fee arrangement with Thayer was to compensate him for his past work on the PaineWebber matter. DiBella knew that he was not expected to render any financial or investment advice to Thayer and did not in fact render any advice. Before conferring with Malek, DiBella asked Silvester to increase the amount of Fund assets invested with Thayer and expected to receive a higher fee as a result. Based on DiBella's activity, it was not an abuse of discretion for the district court to conclude that a reasonable jury could find that DiBella knew that the Thayer investment defrauded the Fund and that DiBella acted to encourage the Thayer investment and thus the fraud.

II.     Jury Instructions

In a civil case, this Court "review[s] jury instructions as a whole to determine if they

provide a misleading impression or inadequate understanding of the law and will reverse on this basis only if the appellants can show that in viewing the charge given as a whole, they were prejudiced by the error." *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) (internal citation, quotation marks, and brackets omitted); *see also* Fed. R. Civ. P. 51. "[T]his Court may review jury instructions and verdict sheets for fundamental error even when a litigant has not complied with the Fed. R. Civ. P. 51 objection requirements." *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 62 (2d Cir. 2002) (internal quotation marks omitted). The fundamental error standard "is more stringent than the plain error standard applicable to criminal appeals under Federal Rule of Criminal Procedure 52(b)." *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004). For the error to be fundamental, it must be "so serious and flagrant that it goes to the very integrity of the trial." *Jarvis*, 283 F.3d at 62 (internal quotation marks omitted). Defendants-appellants did not object to the jury instruction at trial, and therefore this Court reviews the instruction for fundamental error.

In instructing the jury, the district court explained that the legislative purpose of both section 10(b) and section 206(2) is to "ensure fair dealing and to outlaw deceptive and unfair practices by those selling or buying securities. The statutes themselves and the rules adopted by the SEC under the statutes are designed to support investor expectations that the securities markets are free from fraud and to prohibit schemes that are contrary to fair dealing." The district court then explained that the SEC charged that Silvester violated section 10(b) and Rule 10b-5 "by engaging in a fraudulent scheme, pursuant to which he arranged, so as to pay for unrelated work, political favors, and future goodwill, for the [d]efendants[-appellants] to receive

substantial fees despite providing no meaningful work in connection with Silvester's investment of . . . Fund money with Thayer" and by "fail[ing] to disclose this arrangement to the . . . Fund."

With regard to aiding and abetting, the district court explained the elements of a section 206(2) violation. The district court went on to explain that the SEC "contends that the Defendants were aware of the fraudulent nature of the fee arrangement and that they provided substantial assistance to the fraud by entering into the arrangement with Thayer, by successfully soliciting a larger investment by the Pension Fund in order to increase their fees, and by ultimately accepting payment despite having performed no meaningful services."

The district court did not commit fundamental error by not instructing the jury on the definition of "meaningful work" or of "meaningful services." First, the term meaningful was not part of the statute and was intelligible enough to be understood by a lay jury for its plain definition.[12] Most importantly, the omission of a definition for "meaningful work" or "meaningful services" did not "mislead[] the jury as to the correct legal standard." *Hathaway v. Coughlin*, 99 F.3d 550, 552 (2d Cir. 1996). Second, whatever error the district court committed in failing to instruct the jury on meaningful work was not fundamental. The district court's instructions with regard to both underlying violations and DiBella's specific violation were sufficient to give the jury adequate instruction on DiBella's potential liability and the rationale for that liability.

III.    Silvester's Prior Bad Acts

---

[12] According to Webster's Dictionary, "meaningful" is defined as: "having meaning, function, or purpose" or "full of meaning." WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005).

Under the Federal Rules of Evidence,

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b). Defendants-appellants claim the district court harmfully erred in admitting Silvester's prior bad acts.

This Court "accord[s] considerable deference to a district court's decision to admit [404(b)] evidence, and . . . will reverse only for abuse of discretion." *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006). "A district court's erroneous decision to admit evidence at trial does not require reversal of the judgment if that error is harmless. An error in admitting evidence is harmless if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *United States v. Edwards*, 342 F.3d 168, 178 (2d Cir. 2003) (internal citation and quotation marks omitted).

The district court did not abuse its discretion in admitting evidence of Silvester's conduct. The conduct goes to Silvester's knowledge or absence of mistake because it demonstrates that Silvester knew how to illegally take advantage of his position as Treasurer for personal gain.

Furthermore, even if the district court abused its discretion in admitting Silvester's testimony, the error was harmless. As discussed above, there was substantial evidence to conclude that defendants-appellants aided and abetted Silvester, Malek, and Thayer in their respective violations. The district court instructed the jury three times – including immediately

after Silvester's testimony and at the conclusion of the trial – that the jury should not impute Silvester's bad acts to DiBella. This was sufficient to prevent the jury from imputing any of Silvester's previous wrongdoing to defendants-appellants. Therefore, the district court did not commit harmful error, if it committed error at all, in admitting the evidence of Silvester's prior bad acts. *See United States v. Massino*, 546 F.3d 123, 130 (2d Cir. 2008).

IV.     Civil Penalty and Disgorgement

The district court has jurisdiction to impose "a civil penalty to be paid by the person who committed [a] violation" of "any provision of [the Advisers Act]." 15 U.S.C. § 80b-9(e)(1). The defendants-appellants argue that, because a civil penalty is to be paid "by the person who committed [the] violation," the statute only confers on the district court the power to assess a civil penalty against those who commit the principal violation and not to those who aided and abetted the principal violation. In support of their argument, defendants-appellants refer to 15 U.S.C. § 80-9(d), which gives the district court the authority to enjoin aiders and abettors of Advisers Act violations. The defendants-appellants reason that the absence of "aiders and abettors" in the civil penalty provision – but the inclusion of "aiders and abettors" in the injunction provision – demonstrates that civil penalties do not apply to aiders and abettors and that the only remedy against aiders and abettors of Advisers Act violations is an injunction. We disagree.

Section 80b-9(e)(1) provides that when "*any person has violated any provision* of [the Advisers Act], . . . the court shall have jurisdiction to impose . . . a civil penalty to be paid by the person who committed *such violation*." 15 U.S.C. § 80b-9(e)(1) (emphasis added). Included

within a "violation" of the Advisers Act is the aiding and abetting of principal violations of the Advisers Act. *See, e.g., SEC v. Tambone*, 550 F.3d 106, 146-47 (1st Cir. 2008); *Wash. Inv. Network*, 475 F.3d at 406; *compare* 15 U.S.C. § 80b-14 (conferring jurisdiction on district court over violations of the Advisers Act), *with* 15 U.S.C. § 80b-9(d) (permitting SEC to request injunction in district court against, *inter alios*, aiders and abettors of principal violators of the Advisers Act). Thus, the civil penalty provision encompasses both primary and secondary violators of the Advisers Act.

A construction under which aiders and abettors are absolved from civil penalty liability is counter to Congress's intent in enacting the Advisers Act to ensure that the "highest ethical standards prevail[ed] in every facet of the securities industry." *Capital Gains Research Bureau*, 375 U.S. at 186-87 (internal quotation marks omitted). "Where an examination of the statute as a whole demonstrates that a party's interpretation would lead to absurd or futile results plainly at variance with the policy of the legislation as a whole, that interpretation should be rejected." *Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir. 1996) (internal quotation marks and ellipsis omitted). Therefore, the district court was legally able to impose civil penalties on defendants-appellants for aiding and abetting Thayer and Malek's section 206(2) violation and did not abuse its discretion in doing so.[13]

Defendants-appellants next argue that the district court abused its discretion in requiring defendants-appellants to disgorge $374,500 because: (1) there is no legal basis for disgorgement

_____

[13] The district court also did not abuse its discretion in alternatively concluding that it could impose civil penalties on defendants-appellants for aiding and abetting Silvester's section 10(b) and Rule 10b-5 violations.

because the Advisers Act does not apply, and (2) disgorgement is limited to "profits reaped through his securities law violations." *See SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). Defendants-appellants argue that because the money came from Thayer and not the Fund, "DiBella received nothing as a result of any alleged violation by Silvester."

First, as earlier demonstrated, the Advisers Act applies to defendants-appellants' violation. Second, disgorgement of defendants-appellants' fee is appropriate notwithstanding the fact that the fee came from Thayer and not the Fund. We noted in *Cavanagh* that "disgorgement has been used by the SEC and courts to prevent wrongdoers from unjustly enriching themselves through violations, which has the effect of deterring subsequent fraud." *Id.* Therefore, the source of the fee is not relevant in this case for purposes of analyzing whether disgorgement was appropriate. The inquiry is whether defendants-appellants were unjustly enriched by aiding and abetting the section 10(b), Rule 10b-5, and section 206(2) violations. DiBella and NCV received compensation as a result of aiding and abetting a fraud perpetrated against the Fund and the state and were therefore unjustly enriched. In fact, the fraud committed on the Fund was the linchpin necessary to ensure that defendants-appellants were compensated. Had Silvester not chosen to invest Fund assets with Thayer, defendants-appellants would not have been paid the fee at issue. Therefore, the district court did not abuse its discretion in imposing disgorgement on defendants-appellants.

**Conclusion**

The order of the district court denying defendants-appellants' motion for new trial and for judgment as a matter of law is AFFIRMED. There was substantial evidence to support the jury verdict, and the district court did not abuse its discretion in imposing civil penalties or disgorgement.