12-2075-cv
In re Amaranth Nat. Gas Commodities Litig.

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2012

(Argued: February 15, 2013          Decided: September 23, 2013)

No. 12-2075-cv

_____

IN RE: AMARANTH NATURAL GAS COMMODITIES LITIGATION

ROBERTO E. CALLE GRACEY, on behalf of himself and all others similarly situated, JOHN F. SPECIAL, GREGORY H. SMITH, on behalf of himself and all others similarly situated, ALAN MARTIN, individually and on behalf of all other persons similarly situated,
*Plaintiffs-Appellants*,

-v.-

J.P. MORGAN CHASE & CO., J.P. MORGAN CHASE BANK, INC., J.P. MORGAN FUTURES, INC.,
*Defendants-Appellees*,

AMARANTH ADVISORS, LLC, AMARANTH ADVISORS CALGARY ULC, AMARANTH CAPITAL PARTNERS LLC, AMARANTH PARTNERS LLC, NICHOLAS M. MAOUNIS, ALX ENERGY INCORPORATED, JAMES DELUCIA, GOTHAM ENERGY BROKERS INC., AMARANTH MANAGEMENT LP, AMARANTH INTERNATIONAL ADVISORS L.L.C., AMARANTH LLC, AMARANTH GROUP INC., AMARANTH INTERNATIONAL LIMITED, JAMES DELUCIA, L.P., BRIAN HUNTER, TFS ENERGY FUTURES LLC, MATTHEW DONOHOE,
*Defendants*.

_____

Before:        SACK, HALL, and LIVINGSTON, *Circuit Judges*.

Plaintiffs-Appellants appeal from orders of the United States District Court for the Southern District of New York (Scheindlin, *J.*) dismissing their claim against Defendants-Appellees for aiding and abetting commodities manipulation in violation of Section 22 of the Commodities Exchange Act, 7 U.S.C. § 25. On appeal, Plaintiffs-Appellants argue that their amended complaint adequately states such a claim. We disagree, and therefore **AFFIRM**.

CHRISTOPHER LOVELL (Gary S. Jacobson, Amanda N. Miller, Lovell Stewart Halebian Jacobson LLP, New York, NY, Peter D. St. Phillip Jr., and Vincent Briganti, Lowey Dannenberg Cohen & Hart, P.C., White Plains, NY, *on the brief*), Lovell Stewart Halebian Jacobson LLP, New York, NY, *for Plaintiffs-Appellants*.

ERIC S. GOLDSTEIN (Daniel J. Toal, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendants-Appellees*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

In the fall of 2006, Amaranth Advisors LLC ("Amaranth"), a hedge fund that had heavily invested in natural gas futures, collapsed. A Senate investigation would later conclude that Amaranth, in the months leading up to its demise, had taken positions in natural gas futures and swaps so massive that its trading directly affected domestic natural gas prices and price volatility. *See Staff Report of S. Permanent Subcomm. on Investigations, Comm. on Homeland Security and Governmental Affairs, 110th Cong., Excessive Speculation in the Natural Gas Market* 6 (2007) ("Senate Report"). Plaintiffs-Appellants, traders who had bought or sold natural gas futures during these same months, filed a

complaint in the United States District Court for the Southern District of New York alleging that Amaranth had manipulated the price of natural gas futures in violation of the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq*. Plaintiffs-Appellants also alleged that Defendants-Appellees J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, Inc., and J.P. Morgan Futures, Inc. ("J.P. Futures") (collectively, "J.P. Morgan") had aided and abetted Amaranth's manipulation of natural gas futures through J.P. Futures's services as Amaranth's futures commission merchant and clearing broker. The district court (Scheindlin, *J.*), in October 6, 2008 and April 27, 2009 orders, concluded that both Plaintiffs-Appellants' complaint and amended complaint failed to state claims against J.P. Morgan.

Plaintiffs-Appellants argue on appeal that the district court did not apply the correct standard for evaluating the sufficiency of their amended complaint and likewise failed to recognize the amended complaint's well-pleaded allegations that J.P. Futures aided and abetted Amaranth's manipulation within the meaning of Section 22 of the CEA, 7 U.S.C. § 25(a). We conclude that the district court did not err in concluding that Plaintiffs-Appellants' amended complaint failed to state a claim against J.P. Futures. Because we conclude that this is so even under the pleading standards that Plaintiffs-Appellants argue should apply, we do not decide whether the district court's application of a more stringent standard was error.

**BACKGROUND**

1. *Commodity Futures Trading*

The CEA prohibits manipulation of the price of any commodity or commodity future. *See* 7 U.S.C. §§ 9(1), 13(a)(2). While the CEA itself does not define the term, a court will find manipulation where "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010).[1] This case is about the alleged manipulation of natural gas futures traded on the New York Mercantile Exchange ("NYMEX"). The alleged manipulative scheme, however, also involved a second standardized

---

[1] Since the events alleged in Plaintiffs-Appellants' amended complaint, the CEA has undergone some significant changes. Among them, Congress amended 7 U.S.C. § 9(1) to prohibit the use of "any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the [Commodity Futures Trading] Commission shall promulgate." *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Tit. VII, § 753(a), 124 Stat. 1376, 1750 (2010); *see also* 7 U.S.C. § 25(a)(2) (providing private right of action for violation of such rules and regulations). The Commodity Futures Trading Commission ("CFTC") has since promulgated a regulation making it unlawful for any person to "intentionally or recklessly" manipulate prices through various deceitful or fraudulent conduct. *See* 17 C.F.R. § 180.1(a) (2013). This regulation does not impact the present appeal, however, given the regulation's effective date of August 15, 2011. *See* Prohibition on the Employment or Attempted Employment of Manipulative and Deceptive Devices, 76 Fed. Reg. 41398, 41398 (July 14, 2011). The CFTC also promulgated a separate regulation at the same time for cases of manipulation not involving deceitful or fraudulent devices, and explained that interpretation of that regulation "will be guided" by existing law on commodities manipulation. *See* 17 C.F.R. § 180.2 (2013); 76 Fed. Reg. at 41407.

energy contract: natural gas swaps traded on the Intercontinental Exchange ("ICE"), an electronic exchange based in Atlanta, Georgia. A full understanding of Plaintiffs-Appellants' allegations requires background on both of these financial instruments and their respective exchanges.

A.  NYMEX Natural Gas Futures

NYMEX is a futures and options exchange based in New York City. *N.Y. Mercantile Exch. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 110 (2d Cir. 2007). We have previously described the basic features of commodity futures trading:

> A commodities futures contract is an executory contract for the sale of a commodity executed at a specific point in time with delivery of the commodity postponed to a future date. Every commodities futures contract has a seller and a buyer. The seller, called a "short," agrees for a price, fixed at the time of contract, to deliver a specified quantity and grade of an identified commodity at a date in the future. The buyer, or "long," agrees to accept delivery at that future date at the price fixed in the contract. It is the rare case when buyers and sellers settle their obligations under futures contracts by actually delivering the commodity. Rather, they routinely take a short or long position in order to speculate on the future price of the commodity. Then, sometime before delivery is due, they offset or liquidate their positions by entering the market again and purchasing an equal number of opposite contracts, *i.e.*, a short buys long, a long buys short. In this way their obligations under the original liquidating contracts offset each other. The difference in price between the original contract and the offsetting contract determines the amount of money made or lost.

*Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 24 (2d Cir. 1985).

5

One type of futures contract traded on NYMEX is for the delivery of natural gas. In its standard form, this contract obligates the buyer to purchase 10,000 MMBtu[2] of natural gas released during the contract's delivery month at the Henry Hub distribution facility in Erath, Louisiana. Trading on the future begins five years before the delivery month and ends three business days before the first calendar day of the delivery month. To determine the future's final price, NYMEX uses a weighted average of the trades executed during the final half hour of trading—2:00 to 2:30 P.M.—on the last trading day. This final half hour is referred to as the contract's "final settlement period," and final price as the "final settlement price."

NYMEX is a designated contract market, or "DCM." As a DCM, NYMEX may offer options and futures trading for any type of commodity, but is subject to extensive oversight from the Commodity Futures Trading Commission ("CFTC"). *See* 7 U.S.C. §§ 6(a)(1), 7. Among other things, NYMEX must maintain an internal monitoring and compliance program that meets statutory criteria listed in the CEA. *See id.* § 7. One of these criteria is that NYMEX establish position limits and accountability levels for each type of contract that it offers for trading. *See id.* § 7(d)(5). A "position limit" is a cap on the number of contracts that a trader may hold or control for a particular option or future at

---

[2] 1 MMBtu is equal to 1 million BTU (British Thermal Unit).

a particular time, with exceptions provided for traders engaged in bona fide hedging. *See id.* § 6a(a)(2)(A), (c)(1). An "accountability level" provides that once a trader holds or controls a certain number of contracts for a particular option or future she must provide information about that position upon request by the exchange and, if the exchange so orders, stop increasing her position. At the time of the events alleged in the amended complaint, NYMEX had set a position limit of 1,000 contracts, net short or net long, for any natural gas future, applicable during the last three days of trading. NYMEX had also set corresponding accountability limits, which varied in size based on the trader's capitalization and applied at all times the future was traded.

All trades on NYMEX must go through the exchange's clearinghouse. To finalize, or "clear," a trade, traders must transact with a NYMEX clearing member—a firm approved as a member of the clearinghouse. The seller's clearing firm will sell the contract to the clearinghouse, which then sells the contract to the buyer's clearing firm. Through this act of simultaneously buying and selling the contract, the clearinghouse guarantees both sides of the trade and ensures that neither buyer nor seller is exposed to any counterparty credit risk. The clearing firms, in turn, guarantee their clients' performance to the clearinghouse.

To protect itself from risk of nonpayment, the NYMEX clearinghouse requires that its members deposit margin sufficient to cover any potential short-term losses on their clients' open positions. At the end of each trading day, the clearinghouse examines the change in value to these positions and determines whether the firm must post additional margin (generally the case if value has decreased) or receives payment on margin (generally the case if value has increased). This process is called "marking-to-market." *See N.Y. Mercantile Exch.*, 497 F.3d at 111. Clearing firms engage in the same process with their customers, requiring an initial margin payment for any newly acquired position and conducting a daily recalculation of that margin requirement as the position changes in value.

In addition to clearing members, traders on NYMEX also interact with futures commissions merchants, or "FCMs." "An FCM is the commodity market's equivalent of a securities brokerage house, soliciting and accepting orders for futures contracts and accepting funds or extending credit in connection therewith." *First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1110 (D.C. Cir. 2000); s*ee also* 7 U.S.C. § 1a(28). FCMs must register with the CFTC, *see id.* § 6d(a)(1), and are subject to numerous regulatory requirements. A firm may be both a clearing member and an FCM. Such dual status would enable it to both accept orders from clients and clear any resulting trades.

8

B. <u>ICE Natural Gas Swaps</u>

ICE is an electronic commodity exchange based in Atlanta, Georgia. At the time of the events alleged in the amended complaint, ICE offered trading in natural gas swaps.[3] Swaps, unlike futures contracts, do not contemplate delivery of the underlying commodity. Rather, in a typical commodity swap, the buyer agrees to pay the seller a fixed amount of money and the seller agrees to pay the buyer the price of an underlying commodity at the time the swap expires. For ICE's Natural Gas Henry Hub Swap, this "floating value" paid by the seller was the final settlement value of the NYMEX natural gas future for the corresponding month. Hence, if the final settlement value of the NYMEX natural gas future was above whatever price the buyer paid for the swap, the buyer would profit; if it was below, the seller would.

Since the settlement price of an ICE Henry Hub natural gas swap was pegged to the final settlement price of the corresponding NYMEX natural gas future, the two instruments were functionally identical for risk management purposes. Indeed, arbitrageurs ensured that their prices moved in virtual lockstep with one another. Whether a trader decided to transact in ICE swaps

---

[3] ICE has since stopped offering natural gas swaps for trading, and instead offers trading in natural gas futures and options. *See* Press Release, *ICE Completes Transition of Energy Swaps to Futures* (Oct. 16, 2012), http://ir.theice.com/release detail.cfm?ReleaseID=713717.

or in NYMEX futures often depended on factors such as which market had greater liquidity.

An important difference between the two instruments, however, was that ICE did not face the same level of regulatory oversight as did NYMEX. At the time of the events alleged in the amended complaint, ICE qualified as an "exempt commercial market," or "ECM," under the CEA.[4] While this status limited both the type of instruments ICE could offer for trading and the parties that could trade them, it also exempted ICE from most of the regulatory obligations placed upon NYMEX. *See* 7 U.S.C. § 2(h)(3) (2006). As an ECM, ICE did not have to set position limits or accountability levels, nor did it need to monitor trading to ensure compliance with market rules and prevent manipulation.

---

[4] In 2008, Congress increased the CFTC's oversight of any ECM that offered trading in products the CFTC deemed to be "significant price discovery contracts." *See* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Tit. XIII, Sub. B, 124 Stat. 1651, 2197–2204. Two years later, the Dodd-Frank Wall Street Reform and Consumer Protection Act repealed the statutory basis for ECMs. *See* Dodd-Frank Act § 723, 123 Stat. at 1675 (repealing 7 U.S.C. § 2(h)(3)–(5)). The effective date of this repeal was July 16, 2011. *Id.* The CFTC, however, has conditionally exempted preexisting ECMs from compliance with the new laws as it works to implement Dodd-Frank's changes. *See* CFTC Letter No. 13-28, No-Action Letter (June 17, 2013) (providing conditional no-action relief until October 2, 2013).

At the time of the events alleged in the amended complaint, ICE did not have a central clearinghouse.[5] ICE did, however, permit its traders to employ clearing firms, and many of the companies that operated as clearing firms on NYMEX also operated as clearing firms on ICE.

2. *Factual Background*

The following facts are taken from the amended complaint, the allegations of which we accept as true, as well as from other materials referenced in the amended complaint. *See, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013).

A. <u>Amaranth</u>

Amaranth was a multi-strategy hedge fund based in Greenwich, Connecticut. Founded in 2000, Amaranth initially pursued an investment strategy that did not particularly focus on energy trading. This changed over the next half-decade, however, and by 2005 energy trading consumed over thirty percent of Amaranth's capital. Amaranth profited from this focus on energy when, in late 2005, Hurricanes Katrina and Rita disrupted domestic natural gas distribution. The resultant spike in prices produced returns on Amaranth's investments so large that energy trading would ultimately account for 98% of the

[5] In 2009, ICE acquired The Clearing Corporation, an independent clearing house. *See* http://www.clearingcorp.com.

11

fund's 2005 performance. By the beginning of 2006, Amaranth managed over $8 billion in assets and employed over 400 people.

Amaranth continued to focus on energy trading in 2006. Among other things, it began to acquire large "spread" positions in NYMEX natural gas futures.[6] Specifically, Amaranth acquired "calendar" spreads between natural gas futures for different months. Since many homes and businesses use it for indoor heating, natural gas has a highly seasonal price that rises in the colder winter months and falls in the warmer summer months. By taking large spread positions, Amaranth was betting that the difference between these winter and summer prices would increase.

Amaranth started to build up short positions for the March 2006, April 2006, and November 2006 NYMEX natural gas futures, while at the same time acquiring a long position for the January 2007 future. The sizes of these positions were exceptional. Most traders consider control of only a few hundred contracts to be a substantial position; a position of 10,000 NYMEX natural gas futures contracts, meanwhile, will produce $1,000,000 in profit or loss for every cent of price change. Amaranth, however, soon acquired positions of over 40,000

---

[6] A spread position is created when a trader takes a long position in one future and a short position in another. The trader seeks to profit from changes in the difference between the two futures' prices, rather than from any absolute changes to the futures' prices themselves.

March 2006 and 27,000 April 2006 contracts. These positions also represented a substantial share of the market. By February, Amaranth controlled over half of the open interest on NYMEX November 2006 natural gas futures contracts, and held a similar percentage of January 2007 contracts.

While Amaranth was building its spread positions during the first half of 2006, it also engaged in several unusual transactions, referred to by Plaintiffs-Appellants in their amended complaint as "slamming the close" trades. These trades all followed the same pattern: in the weeks leading up to a NYMEX future's expiration, Amaranth would simultaneously acquire a long position in the future and a short position in the corresponding swap on ICE. Then, during the last half hour of trading on the final trading day—the final settlement period—Amaranth would sell most or all of its long position, thus lowering the future's final settlement price. This would then lower the final settlement price of the corresponding ICE swap, allowing Amaranth to profit from its short position in that swap.

Amaranth engaged in these "slamming the close" trades for the March 2006, April 2006, and May 2006 NYMEX natural gas futures. For example, on the March 2006 future's final trading day, Amaranth acquired a long position in the future of over 3,000 contracts. It then sold off this position during the future's final settlement period, lowering the future's final price by $0.29 and

13

realizing a gain for its short positions of over $29 million. Amaranth engaged in similar conduct the next two months, building up a large long position, selling it off during the final settlement period, and profiting by virtue of short positions on ICE as well as in other NYMEX natural gas futures also suppressed in price by the trades. Subsequent investigations would reveal that Amaranth traders discussed "smashing" the settlement price of these NYMEX futures and directed floor brokers not to sell the contracts until the final minutes of trading.

In conducting these trades, Amaranth violated NYMEX position limits and accountability levels, which prompted investigations from both NYMEX and the CFTC. NYMEX also sought to limit Amaranth's trading for the June 2006 future, even contacting J.P. Futures, Amaranth's clearing broker, in May to remind it that Amaranth needed to remain below applicable position limits. Amaranth failed to heed these warnings, and on June 1 it appeared on a list of traders exceeding applicable accountability levels. Nevertheless, NYMEX's initial response to Amaranth's having again exceeded accountability levels was to recommend their temporary increase. Then in early August, NYMEX informed Amaranth that it should reduce its positions in the September 2006 natural gas future. Amaranth responded by shifting its positions in September and October natural gas futures to the corresponding swaps on ICE. It subsequently increased the size of those positions.

14

By early September 2006, Amaranth had a total open position in natural gas futures and swaps of 594,455 contracts. The fund's ever-increasing positions kept the spreads between winter and summer natural gas prices artificially high. Indeed, energy traders would subsequently describe the spread between winter and summer prices as "clearly out-of-whack" and "ridiculous." The Senate Permanent Subcommittee on Investigations would later conclude that Amaranth "dominated" the domestic natural gas market in 2006, and "had a direct effect on U.S. natural gas prices and increased price volatility in the natural gas market." This investigation would reveal that Amaranth traders discussed using the fund's large positions to, among other things, "push" and "widen" spreads.

By September 2006, however, the market for natural gas moved in ways that disrupted Amaranth's positions. As the winter months approached, it became clearer that the price of natural gas would not rise considerably; the winter/summer price spreads in which Amaranth had invested consequently began to fall. Amaranth, faced with ballooning margin requirements, struggled to find the capital or credit necessary to continue buying large positions that could prop up prices. On the brink of collapse, the fund entered into negotiations with several investment banks to sell off its natural gas positions. These negotiations fell through, and on September 20, 2006, Amaranth sold most of its

15

natural gas portfolio to J.P. Morgan. J.P. Morgan eventually earned $725 million from the takeover. Amaranth liquidated the remainder of its assets.

On July 25, 2007, the CFTC filed a complaint against Amaranth and its head energy trader, Brian Hunter, alleging that they "intentionally and unlawfully attempted to manipulate the price of natural gas futures contracts on the New York Mercantile Exchange ('NYMEX') on February 24 and April 26, 2006 . . . and that Amaranth Advisors L.L.C. made material misrepresentations to NYMEX in violation of Section 9(a)(4) of the [CEA]." *CFTC v. Amaranth Advisors L.L.C.*, No. 07-cv-6682, 2009 WL 3270829, at *1 (S.D.N.Y. Aug. 12, 2009). The defendants settled with the CFTC for a civil penalty of $7.5 million. *Id.* at *3. On July 26, 2007, the Federal Energy Regulatory Commission ("FERC") commenced an administrative proceeding against Amaranth for civil penalties and disgorgement of profits. *See CFTC v. Amaranth Advisors, LLC*, 523 F. Supp. 2d 328, 331 (S.D.N.Y. 2007). Amaranth likewise settled for a civil penalty of $7.5 million.[7]

B. J.P. Futures

Throughout the class period, J.P. Futures served as Amaranth's FCM and clearing firm. This meant, among other things, that J.P. Futures processed and

_____

[7] The D.C. Circuit granted Brian Hunter's petition for review of FERC's orders fining him for his involvement, and concluded that FERC lacked jurisdiction. *See Hunter v. FERC*, 711 F.3d 155, 160 (D.C. Cir. 2013).

16

settled Amaranth's trades on both NYMEX and ICE.[8] J.P. Futures profited from this role: between the beginning of 2005 and September 2006, it earned over $32 million in commissions from Amaranth's trading, as well as fees and interest on Amaranth's margin deposits.

As Amaranth's clearing broker, J.P. Futures "marked to market" Amaranth's positions on a daily basis in order to determine if Amaranth needed to deposit additional margin. This, along with J.P. Futures's other roles as a clearing broker, meant that it knew of Amaranth's positions and trading activity. As the clearing broker, J.P. Futures also knew when Amaranth violated NYMEX position limits or exceeded NYMEX accountability levels. Indeed, NYMEX contacted J.P. Futures directly in May 2006 to warn it about Amaranth's position in the June 2006 NYMEX natural gas future. Additionally, J.P. Futures knew of the positions Amaranth took in connection with its "slamming the close" trades. It similarly knew about the NYMEX and CFTC investigations into Amaranth's trading.

---

[8] Though the amended complaint alleges that J.P. Futures accepted Amaranth's trade orders, other sections of the complaint suggest that Amaranth placed orders directly with floor brokers. In particular, the complaint identified other third-party floor brokers as the brokers who accepted the "slamming the close" trades in March, April, and May 2006. Plaintiffs-Appellants' counsel clarified at oral argument that J.P. Futures permitted Amaranth to contact floor brokers directly to execute trades.

Throughout the class period, J.P. Futures continued to service all of Amaranth's trades, including those that put Amaranth's positions above applicable NYMEX position limits and accountability levels. On one occasion in late May 2006, J.P. Futures bypassed its own internal position limits for natural gas futures in order to clear a series of large trading transactions undertaken by Amaranth. During the summer months of 2006, J.P. Futures regularly granted Amaranth credit limit increases to support its positions on ICE. J.P. Futures facilitated Amaranth's transfer of positions from NYMEX natural gas futures to ICE natural gas swaps, which were beyond CFTC and NYMEX scrutiny. This transfer resulted in higher margin requirements for Amaranth, and thus increased fees and interest for J.P. Futures.

3. *Procedural History*

On July 12, 2007, Plaintiffs-Appellants filed a complaint on behalf of all traders who purchased and sold NYMEX natural gas futures contracts between February 16 and September 28, 2006.[9] Named as defendants were the entities and individuals that formed Amaranth, the entities and individuals that served as Amaranth's floor brokers, and the entities forming J.P. Morgan. The complaint alleged, *inter alia*, that Amaranth had manipulated NYMEX natural gas futures prices in violation of Sections 6(c), 6(d), 9(a), and 22(a) of the CEA,

---

[9] Plaintiffs-Appellants filed a corrected complaint on February 14, 2008.

7 U.S.C. §§ 9, 13b, 13(a), and 25(a). The complaint divided this alleged manipulation into two separate schemes: the "self-fulfilling prophecy" of Amaranth's increasingly large spread positions and the "slamming the close" trades that Amaranth executed in connection with the March, April, and May 2006 NYMEX natural gas futures. The complaint further alleged that J.P. Morgan, by virtue of J.P. Futures's role as Amaranth's FCM and clearing broker, aided and abetted these manipulations in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

Defendants filed a motion to dismiss. In an October 6, 2008 opinion, the district court granted the motion in part and denied it in part. *See In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth I*"), 587 F. Supp. 2d 513 (S.D.N.Y. 2008). The district court determined as an initial matter that Plaintiffs-Appellants' allegations of manipulation were subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *Id.* at 535–36. Applying this standard, the court found that the complaint's "slamming the close" allegations, but not its allegations about Amaranth's exceptionally large open positions, raised a sufficient inference of scienter to state a claim for manipulation under the CEA. *Id.* at 539–41. Turning to the complaint's aiding and abetting claim against J.P. Morgan, the court determined that the complaint raised "a strong inference that [J.P. Futures] had knowledge of the

19

manipulations and intended their success." *Id.* at 544.[10] But it also concluded that J.P. Futures's actions did not go beyond normal clearing services, and that such routine services could not constitute the kind of "overt act" necessary for aiding and abetting liability under the CEA. *See id.* at 545 (citing *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000)). The court consequently dismissed Plaintiffs-Appellants' claim against J.P. Futures, allowing leave to replead. *Id.* at 547–48.

Plaintiffs-Appellants filed an amended complaint on November 26, 2008, bringing the same claims against Amaranth and J.P. Morgan but providing more detailed allegations about the two companies' intent. In an April 27, 2009 opinion, the district court concluded that the amended complaint sufficiently stated a claim against Amaranth for manipulation based on its acquisition of large open positions, but still failed to state a claim against J.P. Futures for aiding and abetting manipulation under Section 22 of the CEA. *See In re Amaranth Natural Gas Commodities Litig.* ("*Amaranth II*"), 612 F. Supp. 2d 376 (S.D.N.Y. 2009). Evaluating the complaint under Rule 9(b), the district court

[10] The district court also concluded, however, that the complaint did not adequately plead scienter with respect to the other J.P. Morgan entities, and thus dismissed the aiding and abetting claim against them without considering whether they had undertaken any actions to assist Amaranth. *See id.* Plaintiffs-Appellants do not argue that this conclusion was error and have not made any other argument as to why the claims against those defendants were not properly dismissed. Accordingly, they have waived any claim as to these dismissals. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

20

found that Plaintiffs-Appellants had "once again failed to adequately support their contention that [J.P. Futures] had committed an overt act in furtherance of the Amaranth entities' alleged manipulation." *Id.* at 392-93. According to the district court, the amended complaint's additional allegations still did not show that J.P. Futures's actions went beyond those routinely provided by clearing firms. *Id.* The court declined to consider Plaintiffs-Appellants' argument that the provision of routine services could constitute aiding and abetting when considered in light of all the circumstances of the case, explaining that it had rejected that argument when it stated in its first opinion that "a clearing broker cannot be held liable as an aider and abettor simply because it performed its contracted-for services." *Id.* at 392-93 (quoting *Amaranth I*, 587 F. Supp. 2d at 545).

Plaintiffs-Appellants' class action claims against Amaranth and the floor broker defendants were eventually certified, and in December 2011 the parties reached a settlement agreement dismissing the claims for $77.1 million. *See In re Amaranth Natural Gas Commodities Litig.*, No. 07-cv-6377, 2012 WL 2149094, at *1 (S.D.N.Y. June 11, 2012). In April 2012, the district court entered final judgments dismissing all remaining claims against the remaining defendants, including J.P. Futures. Plaintiffs-Appellants filed a timely notice of appeal.

21

**DISCUSSION**

1. *Standard of Review*

We review *de novo* a district court's dismissal of a complaint for failure to state a claim. *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 22 (2d Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard requires that the complaint allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are merely consistent with a defendant's liability." *Id.* (internal quotation marks omitted). Applying this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The district court concluded below that Plaintiffs-Appellants' amended complaint was subject to the heightened pleading standard of Rule 9(b). *See Amaranth II*, 612 F. Supp. 2d at 382; *Amaranth I*, 587 F. Supp. 2d at 535. It based its conclusion on this Circuit's statement in *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, a securities manipulation case, that "'a claim for market

manipulation is a claim for fraud.'" *Amaranth I*, 587 F. Supp. 2d at 535 (quoting *ATSI*, 493 F.3d 87, 101 (2d Cir. 2007)).  Plaintiffs-Appellants argue that it was error for the district court to extend *ATSI* to the commodities context.  As support, they point to other district court opinions that have endorsed a case-by-case approach to determining whether a manipulation claim sounds in fraud and thus must satisfy Rule 9(b).  *See CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012); *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 530–31 (S.D.N.Y. 2008). We need not decide this issue, because we conclude that Plaintiffs-Appellants' amended complaint fails to state a claim against J.P. Futures even under the more relaxed standard of Rule 8(a)(2).[11]  For similar reasons, we need not decide whether the district court erred in subjecting the allegations about J.P. Futures's intent to a "strong inference" standard.  *See Amaranth I*, 587 F. Supp. 2d at 535–36 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

2. *Aiding and Abetting under the CEA*

Section 22 of the CEA provides a private right of action against "[a]ny person (other than a registered entity or registered futures association) who

---

[11] We do note for future cases that the current CFTC regulations on manipulation, which were promulgated after the district court's decision, distinguish between fraud-based and other forms of manipulation.  *See* 17 C.F.R. §§ 180.1, 180.2.

23

violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter." 7 U.S.C. § 25(a)(1). This language tracks that of 7 U.S.C. § 13c(a), which establishes aiding and abetting liability generally under the CEA.[12] Congress modeled Section 13c(a) itself, moreover, after the federal statute for criminal aiding and abetting, 18 U.S.C. § 2.[13] *See In re Richardson Secs., Inc.*, CFTC No. 78-10, 1981 WL 26081, at *5 (Jan. 27, 1981) ("The section was modeled after the federal criminal aiding and abetting statute, 18 U.S.C. § 2."); *see also Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987) (noting "that the aiding and abetting provision was modeled on, and was

---

[12] That provision provides, in relevant part:

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a).

[13] That statute provides, in part:

> Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

18 U.S.C. § 2(a).

24

intended to be interpreted consistently with, the federal statute that makes aiding and abetting a crime, 18 U.S.C. § 2").

Accordingly, both the CFTC and courts have determined that the standard for aiding and abetting liability under the CEA is the same as that for aiding and abetting under federal criminal law. The CFTC has held, drawing from Judge Learned Hand's classic formulation of criminal aiding and abetting liability in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938), that "proof of a specific unlawful intent to further the underlying violation is necessary before one can be found liable for aiding and abetting a violation of the [CEA]." *In re Richardson Secs.*, CFTC No. 78-10, 1981 WL 26081, at *5. The Seventh Circuit has likewise noted that "[t]he elements that a plaintiff must allege to state a claim for aiding and abetting under § 22 of the CEA are therefore the same elements that must be established to prove a violation of 18 U.S.C. § 2." *Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998). The Seventh Circuit articulated these elements, consistent with its own case law on criminal aiding and abetting, as: "that [defendant] (1) had knowledge of the principal's . . . intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *Id.* The Third Circuit has endorsed the same definition. *See Nicholas v. Saul Stone & Co.*, 224 F.3d 179, 189 (3d Cir. 2000).

25

This Circuit has yet to articulate a precise standard for aiding and abetting liability under the CEA. We agree that Section 22 should be interpreted consistently with the criminal law, and that a complaint therefore states a claim for aiding and abetting under 7 U.S.C. § 25 when it plausibly alleges conduct that would constitute aiding and abetting under 18 U.S.C. § 2. We have not typically evaluated criminal aiding and abetting under a three-part test, however, but have instead continued to follow Judge Hand's statement in *Peoni* that aiding and abetting requires the defendant to "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." 100 F.2d at 402; *see also United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (citing *Peoni* as the "traditional understanding of the law of aiding and abetting"). We do not understand this traditional articulation of the standard to differ, in substance, from the standard employed by the Seventh and Third Circuits.[14] Because this articulation of the test for aiding and abetting is the one with which the courts of this Circuit are most familiar, however (as well as to avoid the confusion potentially generated by using two different articulations for the same substantive legal standard), we conclude that Judge Hand's formulation,

[14] Indeed, *Damato* also endorses *Peoni* as the "traditional understanding of aiding and abetting liability." *See* 153 F.3d at 472 & n.10.

26

understood in light of our subsequent case law on 18 U.S.C. § 2, most properly states the standard for aiding and abetting under the CEA.

We recently reaffirmed *Peoni*'s continued validity in *SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012), which found the standard helpful for determining aiding and abetting liability under the Securities Exchange Act.[15]  In reversing the district court's dismissal of an SEC complaint, we held that the "substantial assistance" prong of aiding and abetting under the Act was commensurate with *Peoni*.  *Id.* at 212.  That is, in order to allege substantial assistance, the SEC must plead, as *Peoni* instructs, that the defendant associated himself with a violation of the Act, participated in it as something that he wished to bring about, and sought by his actions to make the violation succeed.  *Id.*  As the panel explained, "Judge Hand's standard has thus survived the test of time, is clear, concise, and workable, and governs the determination of aider and abettor liability in securities fraud cases."  *Id.*

---

[15] Section 20(e) of the Securities Exchange Act permits the SEC to bring an action against "any person that knowingly or recklessly provides substantial assistance" to a primary violator of the securities laws.  15 U.S.C. § 78t(e). To prove a violation of the Section, the SEC must show: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (internal quotations omitted). Section 20(e) now also reaches reckless conduct, though this was not the case at the time of the events in *Apuzzo*.  *See Apuzzo*, 689 F.3d at 211 n.6.

*Apuzzo* is also instructive on how this standard works in the context of Rule 12(b)(6) determinations. The *Apuzzo* panel observed that a nexus exists between a defendant's knowledge of, intent to further, and assistance given to a primary violation. *Id.* at 214–15. That is to say, a complaint with weak allegations about a defendant's affirmative assistance may still state a claim for aiding and abetting if its allegations about the defendant's knowledge and intent are particularly strong, and vice versa. Though the panel discussed this nexus within the context of the three discrete elements of aiding and abetting liability under Section 20(e), it also suggested that the approach equally applies to a standard like *Peoni*'s. *See id.* at 215 ("[I]f a jury were convinced that the defendant had a high degree of actual knowledge . . . they would be well justified in concluding that the defendant's actions, which perhaps could be viewed innocently in some contexts, were taken with the goal of helping the fraud succeed."). We agree. Such an evaluation of the different aspects of a defendant's asserted relationship to the primary violator, consisting of the alleged aider and abettor's knowledge of the primary violation, his intent to further it, and the actions supposedly undertaken to assist it, is inherent in determining whether the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *Peoni*, 100 F.2d at 402.

28

Thus, in sum, the standard for aiding and abetting liability under 7 U.S.C. § 25 is the same as for criminal aiding and abetting under 18 U.S.C. § 2. The best articulation of this standard is that found in *Peoni*. Inherent in *Peoni*'s articulation is a relationship between a defendant's knowledge, intent, and the nature of assistance given. Accordingly, in evaluating a complaint alleging the aiding and abetting of a violation of the CEA, allegations about the defendant's knowledge, intent, and actions should not be evaluated in isolation, but rather in light of the complaint as a whole.

3. *Analysis*

Commodities manipulation requires "that (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *Hershey*, 610 F.3d at 247; *see also DiPlacido v. CFTC*, 364 F. App'x 657, 661 (2d Cir. 2009). There is thus no manipulation without intent to cause artificial prices. Accordingly (and because aiding and abetting requires knowledge of the primary violation and an intent to assist it), Plaintiffs-Appellants were required to allege that J.P. Futures knew that Amaranth specifically intended to manipulate the price of NYMEX natural gas futures and that J.P. Futures intended to help. Looking at the amended complaint as a whole, we conclude that Plaintiffs-Appellants' allegations of such knowledge and

29

intent, considered in connection with the routine services that J.P. Futures allegedly provided to Amaranth, fail to state a claim for aiding and abetting manipulation under the CEA.

As stated earlier, Plaintiffs-Appellants allege that Amaranth manipulated the price of NYMEX natural gas futures in two ways: (1) the accumulation of large open positions that artificially propped up natural gas calendar spreads; and (2) its "slamming the close" trades. Plaintiffs-Appellants allege that J.P. Futures had knowledge of these manipulative schemes because it had information on Amaranth's daily trading activity and open positions on NYMEX and ICE. This information also meant that J.P. Futures knew when Amaranth was in violation of NYMEX position limits or accountability levels. Plaintiffs-Appellants further allege that J.P. Futures performed multiple overt acts to assist Amaranth in its manipulations, including the clearing of trades, the extension of credit, and assistance in moving positions from NYMEX to ICE. According to the amended complaint, J.P. Futures assisted Amaranth because of the large commissions J.P. Futures earned from the fund's trading, as well as fees and interest it earned on the fund's margin deposits.

With respect to Plaintiffs-Appellants' first theory of manipulation—the building of large open positions—the amended complaint alleges, at most, a very weak inference that J.P. Futures actually knew of Amaranth's manipulative

30

intent, much less that it intended to assist in carrying it out. This is for a simple reason: while J.P. Futures may have known about Amaranth's large positions in natural gas futures and swaps, such large positions do not necessarily imply manipulation. A trader may indeed acquire a large position in order to manipulate prices. But a trader may also acquire a large position in the belief that the price of the future will, for reasons other than the trader's own activity, move in a favorable direction. *Cf. In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, *8 (S.D.N.Y. June 28, 2007) (declining to impute intent to manipulate market to defendants simply due to the size of their holdings). Put differently, large positions can be indicative either of manipulation or of excessive speculation. The amended complaint contains no allegation from which we can draw the conclusion that a clearing broker like J.P. Futures would know which is the goal of any particular large position held by a client.

This remains true even if a trader's positions violate applicable position limits and accountability levels. As the CEA explains, position limits and accountability levels are intended not only to prevent manipulation, but also "to diminish, eliminate, or prevent excessive speculation," "to ensure sufficient market liquidity for bona fide hedgers," and "to ensure that the price discovery

31

function of the underlying market is not disrupted." 7 U.S.C. § 6a(a)(3)(B).[16] This makes sense: excessive speculation, just as much as manipulation, can result in market illiquidity and artificial prices. If the violation of these restrictions does not necessarily entail manipulation, moreover, then neither should their evasion: that a trader shifts contracts from NYMEX to ICE in order to maintain a large open position, standing alone, does not reveal why the trader seeks that large position.

The amended complaint's factual allegations illustrate these principles in action. By the start of the class period, Amaranth had realized large profits from the high spread between winter and summer natural gas prices that occurred after Hurricanes Katrina and Rita wreaked havoc on the Gulf Coast in 2005. The positions Amaranth then acquired were consistent with a belief that the same price pattern would happen again in 2006. Thus, while these positions could have suggested manipulative intent, they equally suggested undue confidence that recent history would repeat itself. This strains any inference that J.P. Futures *actually knew*—as opposed to, for example, that J.P. Futures

[16] Though subsection 6a(a)(3)(B) is specifically about position limits set by the CFTC, its description of their purpose applies to position limits and accountability levels generally. Indeed, 7 U.S.C. § 7(d)(5), which relates to position limits and accountability levels set by the exchanges, similarly states that position limits are "[t]o reduce the potential threat of market manipulation *or congestion* (especially during trading in the delivery month)." *Id.* (emphasis added).

simply *should* have known—that Amaranth was manipulating NYMEX natural gas futures.[17]

The allegations supporting Plaintiffs-Appellants' second theory of manipulation—the "slamming the close" trades—present a closer issue. In contrast to the acquisition of large open positions, J.P. Futures has provided no obvious legitimate economic reason why Amaranth would wait until the final minutes of trading to sell large quantities of a particular future. This type of trading activity, while not dispositive of manipulation, does strongly suggest it. Indeed, the district court found that "the timing of the sales are suspicious in themselves." *Amaranth I*, 587 F. Supp. 2d at 535.

Still, per *Peoni* and *Apuzzo*, we must consider J.P. Futures's alleged knowledge and intent regarding Amaranth's "slamming the close" trades in connection with J.P. Futures's alleged actions. The amended complaint does not allege that J.P. Futures did anything more to assist Amaranth in these trades than to provide routine clearing firm services. As previous decisions from this Circuit recognize, such allegations provide only weak evidence that J.P. Futures associated itself with Amaranth's manipulation and "participate[d] in it as in

[17] The amended complaint does not allege that Amaranth's large open positions were part of a traditional manipulative device such as a "corner" or "squeeze." *See* P. Johnson & T. Hazen, 3 *Derivatives Regulation* § 5.02 (2004). Objective indications that a large position is part of such a scheme may raise a more plausible inference of actual knowledge of manipulation.

33

something that [it] wishe[d] to bring about." *Peoni*, 100 F.2d at 402. For example, in *Greenberg v. Bear, Stearns & Co.* we stated that the mere performance of routine clearing services cannot constitute the aiding and abetting of fraud under New York law. *See* 220 F.3d at 29 (quoting *Stander v. Fin. Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1286 (S.D.N.Y. 1990)). And we have observed more recently that the performance of routine clearing services, without more, cannot trigger primary liability under § 10(b) of the Securities Exchange Act. *See Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 466 (2d Cir. 2013).

Granted, *Greenberg* and *Levitt* did not involve commodities trading or the CEA. Their holdings need not control, however, for us to decide the present case. It suffices to conclude that in the circumstances presented here, the provision of routine clearing services, when combined only with allegations that the clearing firm knew of trading activity that was highly suggestive but not dispositive of manipulation, is not enough to state a claim for aiding and abetting under Section 22 of the CEA.[18]

---

[18] We accordingly need not and do not hold that the provision of routine clearing services in commodities trading can *never* constitute aiding and abetting; again, it is necessary to consider an alleged aider and abettor's actions in conjunction with its alleged knowledge and intent. As we said in *Apuzzo*, "the three components of the aiding and abetting test 'cannot be considered in isolation from one another.'" *Apuzzo*, 689 F.3d at 214 (quoting *DiBella*, 587 F.3d at 566).

34

Plaintiffs-Appellants argue that the amended complaint also alleges that J.P. Futures performed "non-routine" tasks to assist Amaranth, including helping to transfer positions from NYMEX to ICE, extending credit limits, and bypassing internal position limits. But these acts, even if they are "non-routine," are alleged to have been performed only in connection with Amaranth's accumulation of large open positions. Plaintiffs-Appellants do not allege that J.P. Futures transferred positions, extended credit limits, or bypassed internal position limits in connection with Amaranth's "slamming the close" trades. Without considering the relevance of such actions in other contexts, then, or in conjunction with other evidence of purposeful association with a primary violator, we need only observe here that J.P. Futures allegedly performed these "non-routine" acts in connection with trading activity that was not as suggestive of manipulation as the "slamming the close" trades, weakening the force of such allegations in stating an aiding and abetting claim.

In sum, with respect to Plaintiffs-Appellants' first theory of manipulation, the amended complaint's allegations allow only a weak inference that J.P. Futures actually knew Amaranth was manipulating natural gas futures through the acquisition of large open positions. This, when considered in connection with the amended complaint's relatively weak allegations about J.P. Futures's assistance to Amaranth, fails to state a claim that J.P. Futures aided and

35

abetted Amaranth's market manipulation by purposefully "seeking by its own actions to make it succeed."  Similarly, while the amended complaint more plausibly alleges that J.P. Futures  actually knew Amaranth's "slamming the close" trades were manipulative, its allegations concerning J.P. Futures's assistance with those trades are even weaker.  This too fails to state an aiding and abetting claim under the CEA.

Though Plaintiffs-Appellants cite several decisions finding aiding and abetting liability under the CEA, none are contrary to our conclusion here.  All these decisions involved defendants who had either greater knowledge of the principal wrongdoing or more active involvement in that wrongdoing.  In *Kohen v. Pacific Investment Management Co.*, for example, the defendant allegedly aided and abetted a "squeeze" on ten-year Treasury note futures by actually acquiring the dominant positions in those futures. 244 F.R.D. 469, 482 (N.D. Ill. 2007).  The defendants in *CFTC v. Johnson*, meanwhile, were liable under Section 22 because they had allegedly forwarded emails they knew to contain false and misleading information about natural gas transactions.  *See* 408 F. Supp. 2d 259, 268–69 (S.D. Tex. 2005); *see also In re Global Minerals & Metals Corp.*, CFTC No. 99-11, 1999 WL 440439 (June 30, 1999) (non-binding CFTC order confirming settlement offer of defendant that allegedly provided both trading facilities and trading advice to principal manipulator).

Nor does J.P. Futures's role as Amaranth's FCM change the outcome. Plaintiffs-Appellants make generalized assertions that J.P. Futures placed *some* of Amaranth's trading orders—as did floor brokers. There are no allegations that J.P. Futures accepted the "slamming the close" trades; to the contrary, the complaint specifically identifies other brokers as the persons who handled these trades. Therefore, at most J.P. Futures's role as an FCM plausibly heightened J.P. Futures's knowledge of the large positions Amaranth held—a fact already known to J.P. Futures as the clearing firm.

Case law does not suggest a different result. Crediting the facts alleged in the complaint as true, J.P. Futures's seemingly minimal involvement as an FCM distinguishes this case from *Miller v. New York Produce Exchange*, which involved a broker described by the court as playing "a dominant and knowing role" in its client's market manipulation. 550 F.2d 762, 767 (2d Cir. 1977). Plaintiffs-Appellants also cite various CFTC decisions, but these are distinguishable from the instant case because they all involved FCMs transmitting wash orders on behalf of clients. *In re Piasio*, CFTC No. 97-9, 2000 WL 1466069, at *3 (CFTC Sept. 29, 2000) *aff'd sub nom. Piasio v. CFTC*, 54 F. App'x 702 (2d Cir. 2002); *In re LFG, L.L.C.*, CFTC No. 01-19, 2001 WL 940235, at *1 (CFTC Aug. 20, 2001); *In re Mitsubishi Corp.*, CFTC No. 97-10, 1997 WL 345634, at *2–3 (CFTC Jun. 24, 1997); *In re Three Eight Corp.*, CFTC No. 88-33,

1993 WL 212489, at *1 (CFTC June 16, 1993). Wash orders are explicitly banned by the CEA and, because they involve simultaneous or shortly spaced transactions to buy and sell the same quantity of a commodity or stock, they are much more recognizable to the broker transmitting them. *See* 7 U.S.C. § 6c(a) (prohibiting "any person to offer to enter into, enter into, or confirm the execution of" a wash sale). In sum, Plaintiffs-Appellants have cited no authority establishing that an FCM must at all times monitor its clients' trading in order to prevent manipulation. Nor is this a viable theory of aiding and abetting liability pursuant to § 25.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.