**20-4080-cv**

𝕴𝖓 𝖙𝖍𝖊
𝕌𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
𝕱𝖔𝖗 𝖙𝖍𝖊 𝕾𝖊𝖈𝖔𝖓𝖉 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

————

AUGUST TERM 2021

ARGUED: JANUARY 19, 2022
DECIDED: MARCH 13, 2024

No. 20-4080-cv

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

MOHAMMED ALI RASHID,

*Defendant-Appellant.*

————

Appeal from the United States District Court for the Southern
District of New York.

————

Before: KEARSE, WALKER, AND SULLIVAN, *Circuit Judges.*

————

This appeal arises from a Securities & Exchange Commission enforcement action brought against Defendant-Appellant Mohammed Ali Rashid, a former employee of private equity firm Apollo Management L.P. Rashid was accused of breaching his fiduciary duties to the Apollo-affiliated private equity funds he

advised by submitting expense reports for phony business expenses that were ultimately paid by the funds. The district court, following a bench trial, determined that Rashid was not liable under § 206(1) of the Investment Advisers Act because he was not aware that the funds, rather than Apollo, would pay for his expenses. The district court concluded, however, that Rashid was liable under § 206(2) of the Act because Rashid was "indifferent," and therefore negligent, as to which entity would pay for his expenses.

Because it was not reasonably foreseeable to Rashid that the funds would pay for his expenses, we conclude that Rashid did not breach his duty of care to the funds or proximately cause their harm. Accordingly, we **REVERSE** the judgment of the district court.

Judge Kearse dissents in a separate opinion.

————

WILLIAM K. SHIREY, Counsel to the Solicitor, (Michael A. Conley, Acting General Counsel, *on the brief*), Securities and Exchange Commission, Washington, DC, *for Plaintiff-Appellee*.

CAITLIN J. HALLIGAN, Selendy & Gay PLLC, New York, NY (Faith E. Gay, Ryan W. Allison, Selendy & Gay PLLC, New York, NY; Theresa Van Vliet, Genovese Joblove & Battista, P.A., Fort Lauderdale, FL, *on the brief*), *for Defendant-Appellant*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

This appeal arises from a Securities & Exchange Commission ("SEC") enforcement action brought against Defendant-Appellant Mohammed Ali Rashid, a former employee of private equity firm

Apollo Management L.P. Rashid was accused of breaching his fiduciary duties to the Apollo-affiliated private equity funds he advised by submitting expense reports for phony business expenses that were ultimately paid by the funds. The district court, following a bench trial, determined that Rashid was not liable under § 206(1) of the Investment Advisers Act because he was not aware that the funds, rather than Apollo, would pay for his expenses. The district court concluded, however, that Rashid was liable under § 206(2) of the Act because Rashid was "recklessly indifferent," and therefore negligent, as to which entity would pay for his expenses. *Sec. & Exch. Comm'n v. Rashid*, No. 17-cv-8223 (PKC), 2020 WL 5658665, at *1 (S.D.N.Y. Sept. 23, 2020).

Because it was not reasonably foreseeable to Rashid that the funds would pay for his expenses, we conclude that Rashid did not breach his duty of care to the funds or proximately cause their harm. Accordingly, we **REVERSE** the judgment of the district court.

Judge Kearse dissents in a separate opinion.

## BACKGROUND

I.      **Factual Background**[1]

A.      **Rashid, Apollo, and the Investment Funds**

Apollo Management L.P., a subsidiary of Apollo Global Management, LLC (together, "Apollo"), is a private equity firm registered as an investment adviser with the SEC. As of 2018, Apollo managed more than $270 billion in assets. Defendant-Appellant

---

[1] The following facts are drawn from the district court's findings of fact and conclusions of law, *see SEC v. Rashid*, No. 17-cv-8223, 2020 WL 5658665 (S.D.N.Y. Sept. 23, 2020), or are otherwise undisputed.

Mohammed Ali Rashid worked for Apollo from 2004 to 2014, ultimately reaching the level of senior partner.

During the relevant period, Apollo managed several investment funds structured as limited partnerships. These private equity funds took large, often controlling, positions in portfolio companies. Each fund was managed by a distinct Apollo-controlled general partner, which delegated its authority to a distinct Apollo-affiliated management company. A limited partnership agreement governed the allocation of expenses between each fund and the corresponding management company. These limited partnership agreements specified that the Apollo-affiliated management company associated with that specific fund was responsible for "[a]dministrative [e]xpenses," including "all costs and expenses . . . incurred in developing, negotiating and structuring Portfolio Investments" and "all ordinary costs and expenses . . . incurred in monitoring Portfolio Investments." App'x 121, 126, 130, 159–60.

As a senior partner at Apollo, Rashid helped manage several funds. In this role, Rashid acted as an "investment adviser" to these funds under the Investment Advisers Act by evaluating and recommending investments, monitoring these funds' portfolio companies, and finding ways to improve their financial performance. *See* 15 U.S.C. § 80b-2(a)(11).[2]

### B. Employee Expense Reports

Apollo tracked employee expenses using a data-entry platform called PeopleSoft. For all expenses, employees were required to enter

---

[2] "Investment adviser" is defined as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." 15 U.S.C. § 80b-2(a)(11).

into a PeopleSoft spreadsheet the type of expense (*e.g.*, "hotel & lodging"), a description of the expense (*e.g.*, "dinner with lawyers while working late on [specific portfolio company]"), and the department associated with the expense (*e.g.*, "private equity"). *Rashid*, 2020 WL 5658665, at \*4 (internal quotation marks omitted) (capitalization standardized). The PeopleSoft spreadsheet also included a column titled "Investment," which required employees to enter a numeric code—referred to herein as an "investment code"[3]— and the name of an entity associated with that expense. Apollo had over 3,500 investment codes, the majority of which corresponded to specific portfolio companies and projects in which the funds invested. Some of the investment codes corresponded to specific funds, but none of the codes corresponded to the Apollo-affiliated management companies that managed these funds.

Apollo maintained written reimbursement policies that outlined which expenses could and could not be reimbursed. The policies generally stated that "Apollo [would] reimburse employees for business and travel expenses incurred while performing their duties, provided the expenses [were] necessary, reasonable and appropriately documented." App'x 119. The guidance given to Apollo employees, however, did not explain who ultimately paid for reimbursements. It also did not instruct employees on how to select the appropriate investment code or the project or entity to list in the "Investment" column of their expense reports.

Apollo employees such as Rashid were not responsible for choosing which entity would ultimately be charged for business expenses submitted on PeopleSoft. That was the responsibility of

---

[3] At Rashid's trial, employees at Apollo variously referred to these codes as "investment code[s]," "project code[s]," "deal code[s]," and "allocation code[s]." *Rashid*, 2020 WL 5658665, at \*5.

5

Apollo's accounts receivable department, which would use the information provided on PeopleSoft to determine which entity (*e.g.*, the fund-specific Apollo management company, the fund, or the portfolio company in which a fund was invested) would be billed for the expense's reimbursement. The controllers employed by the funds also played a role in ensuring that the expenses were charged to the appropriate entity, as they were able to "push back" if they thought the fund was improperly charged for any given expense. *Id.* at 83.

During the relevant time, Apollo's accounts receivable department improperly charged all expenses relating to the monitoring of a fund's portfolio company directly to the fund, in contravention of the fund partnership agreements requiring that the fund-specific Apollo management companies bear the cost of such "administrative expenses."

## C. Rashid's Fraud

Although employees were supposed to submit only business expenses for reimbursement, Rashid regularly sought reimbursement for personal expenses. There is no question that, from 2010 to 2013, Rashid "engaged in a pattern of repeatedly, knowingly and falsely describing personal expenses as business expenses." *Rashid*, 2020 WL 5658665, at *8.[4] These expenses included, for example, travel expenses to Montreal for a friend's bachelor party, Miami for a friend's wedding, Brazil for a vacation with his wife, and New Orleans for the Super Bowl. Rashid also sought reimbursement for expensive dinners and lavish gifts for his friends and family. Rashid intentionally submitted expense reports for these expenses in which

---

[4] The parties stipulated to a limitations period of June 13, 2011 to June 2013, but the district court appropriately considered evidence relating to expense reports submitted outside of that period as it relates to Rashid's state of mind within the limitations period.

he falsely stated that the expenses were related to meetings with executives at his funds' portfolio companies. Such expenses, if legitimate, would have constituted "administrative expenses" payable by the Apollo-affiliated management companies.

Rashid's actions did not escape Apollo's notice. In 2010, Rashid submitted an expense report for a business dinner at "La Contessa," which Apollo recognized was a hair salon and not a restaurant. Apollo admonished Rashid not to submit personal expenses for reimbursement and, following a review of the prior six months' expense reports, Rashid reimbursed Apollo for nearly $8,000 in falsely reported personal expenses. In 2012, Apollo again confronted Rashid, this time for expensing thousands of dollars for personal expenses at a spa and a Beverly Hills clothing store. Apollo conducted a review of Rashid's expenses from the prior year, and Rashid reimbursed Apollo for approximately $7,000 in falsely reported personal expenses.

In 2012, in anticipation of an SEC audit, Apollo retained Paul, Weiss, Rifkind, Wharton & Garrison LLP to review its firm-wide expense allocation procedures. In 2013, Paul, Weiss was retained to specifically review expenses submitted by Rashid. Paul, Weiss, with Rashid's cooperation, identified hundreds of dubious expenses reported by Rashid and ultimately, in 2014, Rashid entered into a separation agreement with Apollo. As part of that agreement, Rashid paid Apollo $325,000 as reimbursement for his fraudulently submitted personal expenses.

In 2016, as part of a settlement, the SEC issued an administrative order requiring Apollo to pay over $52.7 million in disgorgement and fines in relation to Apollo's breaches of its fiduciary duties to the funds. Two of these breaches—Apollo's failure to make adequate disclosures to investors regarding accelerated

monitoring fees to portfolio companies and Apollo's use of client funds to effectively take a $19 million interest-free loan—do not pertain to Rashid. As relevant to this case, the SEC also found that Apollo failed to reasonably supervise Rashid in his submission of expense reports and that Apollo "failed to implement its policies and procedure[s] concerning employees' reimbursement of expenses." App'x 180.

## II. Procedural History

In October 2017, the SEC commenced the present action against Rashid, alleging that Rashid violated §§ 206(1) and 206(2) of the Investment Advisers Act by submitting fraudulent claims for reimbursement, thereby intentionally and negligently defrauding the funds. *See* 15 U.S.C. § 80b-6(1)–(2).[5] The SEC also alleged that Rashid aided and abetted Apollo's violations of §§ 206(1) and 206(2). *See* 15 U.S.C. § 80b-9(d), (f).

The district court (P. Kevin Castel, *Judge*) held a nine-day bench trial, during which 33 witnesses testified. Rashid testified that he had believed that the expenses for which he sought reimbursement were paid by the Apollo-affiliated management companies, not the funds. The district court did not credit his testimony, finding that Rashid was "recklessly indifferent" as to "who would pay [for] his phony business expenses" and that his testimony was "an after-the-fact construct to avoid liability." *Rashid*, 2020 WL 5658665, at *22. Although other employees—including a senior partner and Apollo's current and former CFOs—similarly testified that they had believed

---

[5] Section 206 provides, *inter alia*, that "[i]t shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly[] (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ." 15 U.S.C. § 80b-6.

(mistakenly, as it turned out) that such expenses would be borne by the Apollo-affiliated management companies, the district court concluded that these employees did not have the same reason to investigate because they had not submitted false expense reports. The district court noted that "significant blame" resided with Apollo and its accounts receivable department's billing practices, but that Rashid's falsehoods "began a chain of events that operated as a fraud upon investors in the private equity funds." *Id.* at *22; *see also id.* at *24, 27.

The district court determined that Rashid did not intend to defraud the funds because he had not known the source of reimbursement for his expenses. The district court also found, however, that it was reasonably foreseeable to Rashid that his entry of investment codes corresponding to specific portfolio companies would result in the funds being charged. Accordingly, Rashid should have ensured the funds would not pay for his false business expenses "by drilling down within Apollo." *Id.* at *23.

Consistent with these findings, the district court found that the SEC had failed to prove that Rashid acted with scienter sufficient to support a finding that he violated § 206(1) or aided and abetted Apollo's violation of § 206(1).[6] But the district court found that Rashid had violated § 206(2) by at least negligently breaching his duties to the funds.[7] In remedy, the district court permanently enjoined Rashid from violating § 206 and ordered him to pay a $240,000 civil penalty.

---

[6] The district court did not reach whether Rashid was liable for aiding and abetting Apollo's violation of § 206(2).

[7] The district court noted that scienter under § 206(1) could be proved by a finding of "'conscious recklessness,'" *Rashid*, 2020 WL 5658665, at *23 (quoting *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 (2d Cir. 2020)), but found

This appeal followed.

## DISCUSSION

On appeal, Rashid argues that (1) the district court erred in finding him liable under § 206(2) of the Investment Advisers Act because his actions did not violate his duty of care to the funds or proximately cause the funds' loss; (2) the district court erred by failing to address whether his conduct was material to investors; and (3) the district court abused its discretion by enjoining him from future violations of § 206 without considering collateral consequences to such an injunction. Because we conclude that the district court erred as to the first issue, we reverse without addressing the remaining issues.

## I. Legal Standards

This court reviews conclusions of law *de novo*, findings of fact for clear error, and mixed questions of law and fact under either the *de novo* or clearly erroneous standard, "depending on whether the question is predominantly legal or predominantly factual." *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 873 F.3d 85, 138 n.54 (2d Cir. 2017) (internal quotation marks omitted).

The purpose of the Investment Advisers Act is "to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963); *see also SEC v. DiBella*, 587 F.3d 553, 568 (2d Cir. 2009) ("The 'legislative history of the Advisers Act leaves no doubt that Congress intended to impose enforceable fiduciary obligations' on investment

---

that "Rashid's reckless indifference to the source of his reimbursement did not reflect recklessness approximating actual knowledge." *Id.* at *24.

advisors." (alteration marks omitted) (quoting *Transamerica Mortgage Advisers, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979))). To that end, § 206(2) of the Act makes it unlawful for an investment adviser, such as Rashid, to "engage in any transaction . . . which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2).

Section 206(2) does not have a scienter requirement, and so this section holds investment advisers liable for negligent acts. *See DiBella*, 587 F.3d at 569. Negligence is the failure to exercise the degree of care that a reasonably prudent person would use under like circumstances. *See* Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (2010); 57A Am. Jur. 2d *Negligence* § 5 (2023); *see also* Restatement (Third) of Agency § 8.08 (2006) ("[A]n agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances."). A defendant acts negligently if he fails to exercise reasonable care and, as a result, causes reasonably foreseeable harm. *See* Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (2010). Here, the funds' harm is not disputed, but the parties disagree about the extent of Rashid's duty and, relatedly, whether he proximately caused their harm.

As to duty, the Investment Advisers Act established "federal fiduciary standards to govern the conduct of investment advisers," *Robare Grp., Ltd*, 922 F.3d 468, 472 (D.C. Cir. 2019) (quoting *TAMA*, 444 U.S. at 17). It imposed on advisers "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading [their] clients." *Cap. Gains Rsch. Bureau*, 375 U.S. at 194 (internal quotation marks omitted).

A primary consideration in evaluating whether a person's conduct lacks reasonable care is the "foreseeable likelihood that the

person's conduct will result in harm." Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (2010); *see also Cullen v. BMW of N. Am., Inc.*, 691 F.2d 1097, 1101 (2d Cir. 1982) ("[F]oreseeability of injury is an indispensable requisite of negligence, and . . . negligence exists only when there is a reasonable likelihood of danger as the result of the act complained of."). An action is "reasonably foreseeable" when "a reasonably prudent person would anticipate [it] as likely to result" from the breach. 57A Am. Jur. 2d *Negligence* § 449 (2023).

This reasonable-foreseeability principle extends to the acts of intervening parties in the context of assessing proximate cause. "[A]n intervening act, tortious or criminal, will ordinarily insulate a negligent defendant from liability," unless the intervening act or end result was reasonably foreseeable. *Cullen*, 691 F.2d at 1101; *see also* 57A Am. Jur. 2d *Negligence* § 620 (2023).

**II.    Rashid's Duty of Care and the Alleged Breach**

In concluding that Rashid breached his duty of care to the funds, the district court found that Rashid did not have actual knowledge that the funds were paying for his phony business expenses, but that Rashid *should have* investigated the matter further to ensure that the funds would not pay for such expenses. *See Rashid*, 2020 WL 5658665, at \*23 ("Rashid[,] as a senior partner of Apollo, . . . had the ability to ensure, by drilling down within Apollo, that none of his false business expenses were paid by the funds."). Rashid argues that the district court erred by imposing a heightened duty of care that would require him to have independently discovered Apollo's misbilling practices. We agree that the district court erred because the record demonstrates that a reasonable person in Rashid's shoes would not have known that the funds would pay for his claimed expenses.

Rashid's "affirmative obligation to employ *reasonable* care," *Cap. Gains Rsch. Bureau*, 375 U.S. at 194 (internal quotation marks omitted) (emphasis added), is defined objectively, 57A Am. Jur. 2d *Negligence* § 131 (2023). As explained above, the record shows that many Apollo professionals—including Apollo's current and former CFOs and an employee who held the same title as Rashid—believed that Apollo, and not the funds, would pay for expenses incurred while monitoring the funds. These employees all owed to the funds similar fiduciary duties as Rashid. They are the "reasonable persons" against whom Rashid should be compared when evaluating whether he should have known that the funds would pay for his business expenses. But Rashid's peers did not believe that the funds would pay for reimbursements. In fact, it would have been difficult for any of them to have discovered the truth: that Apollo's accounts receivable department was improperly billing the funds for expenses that should have been allocated to the Apollo-affiliated management companies. And if Rashid *had* decided to look into the matter further, he would have reasonably consulted the fund partnership agreements and reached the same conclusion as his peers: that the Apollo-affiliated management companies were supposed to pay for his claimed expenses. Apollo's reimbursement policies did not say otherwise, and Apollo never informed Rashid of any fact to the contrary when they caught him submitting fraudulent expense reports in 2010 and 2012. On this record, we cannot conclude that Rashid's general fiduciary duties included undertaking the sort of extensive, independent investigation that might have revealed that the funds would pay for his business expenses.

The district court suggests that Rashid owed the funds a heightened duty of care, stating that the other Apollo employees did not have "the same reason as Rashid to ensure that no fund was billed for an expense because they, unlike Rashid, were not submitting false

business expenses." *Rashid*, 2020 WL 5658665, at \*22. Nothing in the record suggests, however, that Rashid's own fraud should have made him more aware of Apollo's charging practices. Nor were the funds at greater risk because his expenses were fraudulent. Indeed, to the funds, *all* expenses charged to them in violation of the fund partnership agreements, whether falsified or not, were harmful. Thus, nothing about Rashid's fraud itself put him on heightened notice of Apollo's billing practices or the potential harm that could result from it. His fiduciary duties to the funds therefore remained unchanged by his fraudulent conduct.

The SEC insists that Rashid violated his fiduciary duties to the funds because, as the district court found, he was "utterly indifferent," *id.* at \*23, as to who would pay for his phony expenses, "notwithstanding his affirmative responsibilit[ies] as a fiduciary to the Funds." Appellee's Br. 41. Our dissenting colleague likewise observes that Rashid "made no effort to find out whether his personal expenses were being billed to the clients he identified." Diss. Op. 9. But Rashid's heightened duty of care as a fiduciary to the funds only required Rashid to "drill down" to the level of a reasonably prudent investment adviser—here, to that of his peers. Reviewing the fund partnership agreements or asking his colleagues would have led Rashid to reasonably believe that Apollo, not the funds, would pay for his claimed expenses.

Any contrary conclusion would not just impose an unduly high duty of care on Rashid, but would be effectively the equivalent of imposing strict liability. And that appears to be the implicit conclusion advanced by the dissent, which would affirm Rashid's liability under § 206(2) simply because his conduct was generally improper. *See id.* at 4–5. Notwithstanding the propriety expected of fiduciaries, however, the Investment Advisors Act imposes only a duty of *reasonable* care on fiduciaries such as Rashid, even when those

fiduciaries' conduct runs afoul of other legal or ethical proscriptions. *Cap. Gains Rsch. Bureau*, 375 U.S. at 194; *see also* Restatement (Third) of Agency § 8.08 cmt. d (2006) ("Although an agent has a duty of diligence, that duty is to make reasonable efforts to achieve a result and not a duty to achieve the result regardless of the effort, risk, and cost involved."). A fiduciary's duties under the Investment Advisers Act are demanding, but they are not boundless. Applying ordinary negligence principles to this case, we conclude that Rashid did not breach his duty of care to the funds by failing to discover that Apollo was improperly charging the funds for his reported expenses.

## III.    Reasonable Foreseeability of the Intervening Cause

Rashid next argues that, because Apollo's intervening actions in improperly charging the funds for administrative expenses were not reasonably foreseeable, his fraudulent reimbursement requests could not have been the proximate cause to the funds' harm. We agree; just as reasonable foreseeability bears on the question of Rashid's duty of care, it also affects our calculus as to proximate cause.

As noted earlier, an intervening action is "reasonably foreseeable" when "a reasonably prudent person would anticipate [it] as likely to result" from the breach. 57A Am. Jur. 2d *Negligence* § 449 (2023). This is an objective standard. As discussed above, Rashid's peers—including the former and current CFOs of Apollo—believed that Apollo, not the funds, reimbursed employees for expenses incurred while monitoring the funds. And the fund partnership agreements confirmed the same. Nevertheless, Apollo's accounts receivable department contravened the terms of the fund partnership agreements—negligently or otherwise—and billed the funds directly for such administrative expenses. Even the funds' controllers, whose job it was to ensure that the funds were not being overcharged, did

not bring to Apollo's attention the fact that its accounts receivable department had erroneously billed the funds.  On this record, we cannot say that a *reasonably* prudent person would have anticipated that the funds would be billed for Rashid's fraudulent expenses.

The district court found that "it was reasonably foreseeable to Rashid that in causing or acquiescing in the entry of a[n investment] code for a portfolio company that the expense would be borne directly by the fund or indirectly by charging it to the portfolio company in which it was heavily invested."  *Rashid*, 2020 WL 5658665, at *23; *see also id.* at *3, 25.  But, as explained above, Apollo employees like Rashid were not responsible for choosing which entity would ultimately be charged for claimed expenses.  Nor could they have been, since Apollo did not explain to employees how the reimbursement process worked.  Instead, Apollo's accounts receivable department would independently determine whether the fund-specific Apollo management company, the fund, or the portfolio company in which the fund was invested would be billed for the expense's reimbursement.

The district court and the dissent make much of the fact that the expense forms bore investment codes that specified the client fund associated with the expenses incurred.  But the code identifier had nothing to do with how a particular expense would be allocated for reimbursement.  Naturally, the accounts receivable department used the information on the expense forms in the process of deciding the entity to whom the expense should be billed.  But the investment code that an employee entered was not determinative of the accounts receivable department's ultimate billing decision.  In fact, our examination of these investment codes reveals that none of the more than 3,500 possible investment codes corresponded to the Apollo-affiliated management companies that were responsible for the administrative expenses claimed by Rashid.  Thus, even if the

16

investment codes used by Rashid identified a particular fund or a portfolio company or project associated with a particular fund, there is no evidence that these investment codes distinguished between expenses chargeable to the fund-specific Apollo management companies and those chargeable to the funds themselves. Accordingly, it would not have been reasonably foreseeable to Rashid (or other employees who also entered such investment codes) that the funds would cover his expenses merely because he entered the investment code associated with a particular fund, portfolio company, or project.

The SEC argues that Rashid, who did not thoroughly read the fund partnership agreements or Apollo's reimbursement policies, "should have reasonably expected as a default assumption that the Funds would be invoiced for the expenses." Appellee's Br. 42. The SEC cites the testimony of an accounting expert to support this default assumption. But the accounting expert at the same time testified that the fund partnership agreements usually govern expense allocation and that he would "defer first" to such agreements to ascertain which entity would pay for which expenses. D. Ct. Dkt. No. 201, at 74–75. The accounting expert's testimony thus does not provide the support the SEC assigns to it.

The SEC's argument fails for another reason: it faults Rashid for not consulting the fund partnership agreements, but then creates a new (conjectural) "default assumption" for Rashid that is at odds with the agreements it claims Rashid should have consulted. *See* Appellee's Br. 42 ("[T]he failure to investigate and understand Apollo's expense-allocation practices was part and parcel of Rashid's negligence."). This position is internally inconsistent and also purports to treat Rashid differently based on his subjective ignorance of Apollo's specific expense-allocation practices. If, as the SEC argues, a reasonably prudent adviser in Rashid's position would have

consulted the fund partnership agreements to determine whether the funds would be charged for his claimed expenses, it follows that the reasonable adviser would not foresee that the funds would bear the cost of such expenses.

Finally, the SEC argues that the causation requirements should be "loosen[ed]" where a defendant breaches his fiduciary duties and that we can therefore disregard "any negligence or error on the part of Apollo in connection with invoicing the Funds." *Id.* at 42–43. It is true that we sometimes "loosen" the stringent causation requirements where a defendant has breached his fiduciary duties. *See Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994). Contrary to the SEC's argument, however, we do not dispense with the causation analysis in its entirety in the context of fiduciary duties. *See id.* (plaintiff must show that defendant's breach was a "substantial factor" contributing to her injury); *Evvtex Co. v. Hartley Cooper Assocs. Ltd.*, 102 F.3d 1327, 1334 (2d Cir. 1996) (finding no error where district court's finding of causation was "implicit").[8] And, in any case, we have concluded that Rashid did not breach his fiduciary duties to the funds, so no loosened analysis would be warranted here.

In sum, we conclude that Apollo's intervening actions in overbilling the funds were not reasonably foreseeable to Rashid, and Rashid therefore did not proximately cause the funds' harm.

---

[8] In *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d Cir. 1983), we concluded that "the district judge was not required to find a 'but for' relationship between [the defendant's] conduct and [the plaintiff's injury]" where the defendant breached its fiduciary duty to the plaintiff. *Id.* at 996. Subsequently, in *Evvtex*, however, we clarified that the district court in *ABKCO Music* had "made an implicit finding of causation" and that "the broadest reading of the *ABKCO Music* holding would likely be limited to the unique facts of that case," which "involved a conflict of interest and breach of fiduciary duty by use of confidential information." *Evvtex*, 102 F.3d at 1334 & n.9.

\*      \*      \*

We recognize that Rashid committed serious, and almost certainly criminal, misdeeds by improperly seeking reimbursement for personal expenses.  But we must not confuse the fraud Rashid committed against his employer with fraud committed against the funds.  Indeed, § 206(2) of the Investment Adviser Act is limited to a "transaction, practice, or course of business which operates as a fraud or deceit upon any *client* or *prospective client*."  15 U.S.C. § 80b-6(2) (emphasis added).  Section 206(2) of the Investment Adviser Act, while broad in its reach, was not intended as a catchall provision to penalize all acts of wrongdoing, untethered to the ordinary negligence principles that apply under that provision.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court.

KEARSE, *Circuit Judge*, dissenting:

Defendant Mohammed Ali Rashid was an "investment adviser" to several private equity funds managed by his employer Apollo Management L.P. ("Apollo"); as such, he was a fiduciary to the funds he managed. He does not challenge on appeal the factual findings of the district court that, *inter alia* (*see* Appendix hereto), for years he "intentionally submitted false expense reports for the purpose of obtaining reimbursement for his personal expenses," *SEC v. Rashid*, 17-cv-8223, 2020 WL 5658665, *2 (S.D.N.Y. Sept. 23, 2020) ("D.Ct. Op."). With all due respect to the majority, I dissent from its rulings that, *inter alia*, "it was not reasonably foreseeable to Rashid that the funds [managed by him] would pay for his [personal] expenses [that he falsely claimed to be business expenses]" (Majority opinion *ante* at 3), and that "Rashid did not breach his duty of care" (*id*.) or "his fiduciary duties to the funds" (*id*. at 19).

Section 206 of the Investment Advisers Act ("Advisers Act" or "Act") not only prohibits investment advisers from intentionally defrauding clients, *see* 15 U.S.C.

§ 80b-6(1), but also prohibits them from "directly or indirectly . . . engag[ing] in any transaction, practice, or course of business which *operates as a fraud or deceit upon any client*," *id*. § 80b-6(2) (emphasis added). A "fundamental purpose" of the Act was "to achieve a high standard of business ethics in the securities industry," *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 186 (1963); and Congress's prohibition against conduct that "operates as" a fraud is "not" limited to fraud "'technically,' as it has traditionally been applied in damage suits between parties to arm's-length transactions involving land and ordinary chattels," *id*. at 195. Instead, § 206 "regulat[es] the special fiduciary relationship between an investment adviser and his client," and "it is quite clear that the [§ 206(2)] language," *i.e.*, "'any . . . practice . . . which *operates* . . . as a fraud or deceit,' . . . focuses not on the intent of the investment adviser, but rather on the effect of a particular practice." *Aaron v. SEC*, 446 U.S. 680, 694 (1980) (emphasis in *Aaron*). Section "206 establishes federal fiduciary standards to govern the conduct of investment advisers." *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979).

"A fiduciary relationship creates the highest duty of loyalty known to the law." *Restatement (Third) of Torts: Liability for Economic Harm* § 16 comment *a* (2020). A fiduciary who "has benefited improperly by engaging in self-dealing, deception, or

other disloyal conduct" has engaged in "conduct inconsistent with the fiduciary duty." *Id*. § 16 comment *c*.

The Advisers Act, consistent with these exacting standards, imposes on investment advisers not only "an affirmative obligation *to employ reasonable care* to avoid misleading his clients," but also "*an affirmative duty of utmost good faith*." *Capital Gains*, 375 U.S. at 194 (internal quotation marks and footnote omitted) (emphases mine). An investment adviser "owe[s] a duty of uncompromising fidelity and undivided loyalty to the Funds' shareholders." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86, 93 (2d Cir. 2010) (internal quotation marks omitted). Section 206(2), in prohibiting conduct that "operates as" a fraud or deceit, reflects Congress's intent to eliminate "conflicts of interest" between an investment adviser and his clients. *Capital Gains*, 375 U.S. at 191. And in "focus[ing] not on the intent of the investment adviser, but rather on the *effect* of a particular practice," *Aaron*, 446 U.S. at 694 (emphasis added), and thus prohibiting any transaction that "functions or otherwise results in a fraud," the Act makes investment advisers "liable [for] negligent acts," *SEC v. DiBella*, 587 F.3d 553, 569 (2d Cir. 2009).

In the present case, the district court concluded that Rashid could not be held liable for intentional fraud under § 206(1) of the Act, despite his deliberate and

knowing submission of false expense reimbursement requests, because Apollo's "expense allocation and reimbursement process" had not been explained in its written guidance to employees, D.Ct. Op., 2020 WL 5658665, at *21. To be clear, this did not mean that the court "*determined that Rashid did not intend* to defraud the funds" (Majority opinion at 9 (emphasis added)); rather the court determined that

> *the SEC failed to prove by a preponderance of the evidence that Rashid acted with the scienter required of section 206(1)* in employing a device, scheme or artifice to defraud a fund. To be clear, the record amply demonstrates that Rashid intentionally submitted false expense reports for the purpose of obtaining reimbursement for his personal expenses. But *the SEC failed to prove* that Rashid had *actual knowledge that the funds* paid his expenses, or that his recklessness was of a nature that satisfies the scienter required under the federal securities laws,

D.Ct. Op., 2020 WL 5658665, at *2 (emphases added).

The court rejected, as "not credi[ble]," Rashid's testimony that at the times he submitted his false expense-reimbursement requests, it was his understanding that the expenses would be "paid by an Apollo management company," *id*. at *22, *i.e.*, a company owned and operated by Apollo that was distinct from the fund managed, *id*. at *6. The court found that this testimony was "an after-the-fact construct to avoid liability under the securities laws." *Id*. at *22. It found that Rashid had made no effort to determine whether or not his client funds were being billed for his falsely claimed

-4-

expenses, noting that "[w]hen asked whether he took *any* steps to ensure that his personal expenses were not being billed to individual private equity funds," Rashid testified, "'I don't believe I did.'" *Id.* at *6 (quoting Trial Transcript 933 (emphasis mine)). The court found that "Rashid was recklessly indifferent concerning who would pay his phony business expenses as long as it was not him." *Id.* at *22.

I disagree with the majority's view that Rashid's lack of actual knowledge that Apollo would bill his expenses to his client funds was excusable because other Apollo fund managers, with respect to their respective clients and management companies, also lacked such knowledge. Those other managers were not similar to Rashid. While they too were fiduciaries with respect to their client funds, they were not comparable to Rashid because their personal interests did not conflict with the interests of their clients: The other managers were not seeking reimbursement for their personal trips, meals, gifts, and hairstyling, etc., disguised as business expenses on behalf of their clients.

Rashid knew that he was submitting fraudulent requests for reimbursement of his personal expenses. He had a fiduciary obligation to his client funds to attempt to avoid having those personal expenses passed on to his client. His own testimony supported the finding that he had made no such effort.

-5-

The district court, applying principles of negligence, found that, despite the absence of disclosures in written instructions from Apollo, it was reasonably foreseeable to Rashid that the funds he managed would be billed for the personal expenses he claimed were business expenses. Unlike the majority, I see no error in this finding. The expense report forms that Apollo required fund managers to use instructed that the entities on whose behalf the claimed expenses had been incurred were to be identified, using codes that were provided. There were "over 3,500 investment codes, [most] of which corresponded to specific portfolio companies and projects in which the funds were invested," with some "correspond[ing] to specific funds." (Majority opinion *ante* at 5 (emphasis added).) But while the Apollo limited partnership agreements creating the funds provided that administrative expenses of monitoring the funds were to be borne by Apollo, the majority opinion correctly notes that "*none of the [expense report form] codes corresponded to the Apollo-affiliated management companies that managed those funds*" (*id*. (emphasis added)).

Rashid, in submitting these forms and requesting reimbursement, entered the codes for funds he managed or for portfolio companies in which those funds were invested. The funds identified by Rashid were the entities to which Apollo billed Rashid's claimed expenses. The district court found that Rashid's

-6-

testimony that he believed his fraudulent expense requests would be borne by Apollo was not credible. *See* D.Ct. Op., 2020 WL 5658665, at \*22. It found that Rashid "[r]epeatedly . . . caused or acquiesced in the entry of internal project codes corresponding to a portfolio company in which a fund held a large equity position, and, thus, it was reasonably foreseeable to him that these phony business expenses would be charged to a fund." D.Ct. Op., 2020 WL 5658665, at \*3. I cannot concur in the majority's view that the district court erred in concluding that Rashid--who as a fiduciary had both "an affirmative duty of utmost good faith" and "an affirmative obligation to employ reasonable care to avoid misleading his clients," *Capital Gains*, 375 U.S. at 194 (internal quotation marks and footnote omitted), and who sought reimbursement using Apollo-mandated forms that did not provide for attribution of an expense to a management company but instead required identification of the funds on whose behalf the expense was supposedly incurred--could reasonably foresee that the expenses he claimed would be billed to the funds he specified.

Principally because of that sustainable finding of foreseeability, I also disagree with the majority's ruling that Rashid's submission of fraudulent expense claims was not a proximate cause of his clients' being billed for those expenses, on the premise that Apollo's billing the clients constituted an "intervening" act (Majority

-7-

opinion at 15-16, 19). *See generally Restatement (Second) of Torts* § 442A (1965) ("Where the negligent conduct of the actor creates or increases the *foreseeable* risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is *not* a superseding cause." (emphases added)); *see also Woodling v. Garrett Corp.*, 813 F.2d 543, 555 (2d Cir. 1987) ("If the intervening act was foreseeable, it does not excuse the original actor that the intervening act was reckless, . . . or intentional, . . . or even intentional and criminal . . . ." (internal quotation marks omitted)).

Moreover, the original tort by Rashid was not his negligence in failing to ensure that his clients were not paying for his personal expenses but rather his deliberate fraud in seeking reimbursement for those expenses. While Rashid did not care who would pay for those expenses, given (a) that he had identified the funds he fraudulently linked to those expenses, (b) that the expense forms did not provide codes for him to link the expenses to a management company, and (c) that his claimed belief that those expenses would be paid by an Apollo management company was not credible, the court did not clearly err in finding that Rashid had reason to expect that the expenses he claimed would be billed to and paid by the funds he identified. Nor did the court err in finding that "[t]he funds had every reason to believe that the

-8-

expenses tendered to them as business expenses were legitimate business expenses, but they were, in fact, personal expenses of Rashid." D.Ct. Op., 2020 WL 5658665, at *23. In these circumstances, even if Rashid had not been a fiduciary, the supposedly "intervening" acts of Apollo would not spare him from liability. *See generally Restatement (Second) of Torts* § 533 (1977) ("*The maker of a fraudulent misrepresentation is subject to liability* for pecuniary loss to another who acts in justifiable reliance upon it *if the misrepresentation, although not made directly to the other, is made to a third person and the maker . . . has reason to expect* that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." (emphases added)).

In sum, the district court found that Rashid--a fiduciary to his client funds--engaged in a long-running practice of knowingly and falsely submitting personal expenses as business expenses, and that "Rashid's behavior was egregious, reckless, and recurrent," D.Ct. Op., 2020 WL 5658665, at *27. These findings and others (*see, e.g.*, attached Appendix) were amply supported by the record, and they are not challenged on appeal. Rashid deliberately sought to defraud someone into paying for his personal expenses. On the requisite expense forms, no code was provided for him to associate expenses with a management company; he provided

-9-

the codes for the client funds he fraudulently linked to those expenses; those funds were billed, and they paid. Despite his fiduciary obligation to avoid conflicts of interest with his client funds, he made no effort to find out whether his personal expenses were being billed to the clients he identified. Rashid self-identified 988 claims that he had submitted for his personal expenses, falsely represented as business expenses for his client funds, totaling $220,796.87. *See id*. at *19.

I dissent from the majority's ruling that the district court erred in concluding that Rashid's conduct "operated as a fraud," on his clients.

**APPENDIX**

The district court's findings of fact, *see* D.Ct. Op., 2020 WL 5658665, at *1-*2, *20-*24--none of which is claimed to be erroneous--included the following:

- Rashid intentionally submitted false expense reports that "contained a pattern of lies," *id*. at *20, *23;

- his claim of "false and fraudulent business expenses" was commonly accompanied by "fabricated factual assertions," including "fabricated attendees and business purposes for expensive restaurant dinners," *id*. at *20;

- the "consistency and precision" of Rashid's fabrications--and the trial

-10-

evidence from the purported attendees demonstrating the falsity of his submitted details--constituted "strong evidence of his intent to lie, and to intentionally submit personal expenses as business expenses," *id.*;

■ that pattern of fabrications "negate[d Rashid's] claims of innocent mistakes," *id.*;

■ Rashid's claim that he believed business expenses would be borne not by the investment funds but instead by Apollo was not credible and was "an after-the-fact construct to avoid liability under the securities laws," *id.* at *22;

■ it was reasonably foreseeable to Rashid that his advisee funds--whose codes he caused to be entered into the expense spreadsheet--would be responsible for the reimbursement of those charges, *see id.* at *23;

■ as an Apollo senior partner, he had the position and ability to find out whether his expenses were being paid by his advisee funds and to prevent that, *see id.*;

■ instead, Rashid exhibited a "wholesale lack of diligence and due care" and was "reckless[ly] indifferen[t] to the source of his reimbursements," *id.* at *19, *24;

■ "if he was not recklessly indifferent, he was at least negligent in failing to protect the funds from the consequences of his thefts which were reasonably foreseeable to him," *id.* at 23;

■ Rashid did not inquire whether the entities he identified would be billed, because he did not care "who would pay his phony business expenses as long as it was not him," *id.* at *22;

■ Rashid "engaged in a long-running practice of knowingly and falsely submitting personal expenses as business expenses and that practice operated as a fraud or deceit upon private-equity funds he advised," *id.*

-11-

at *23;

- Rashid's "repeatedly lying over the course of several years"--which "continued even after being caught"--"was egregious," *id*. at *27;

- Eventually, Rashid "voluntarily repaid all expenses that Apollo identified to be personal in nature, totaling approximately $290,000," *id*.